[No. C041864. Third Dist. Oct. 2, 2003.]

PACIFIC GAS AND ELECTRIC COMPANY, Plaintiff and Respondent, v. DEPARTMENT OF WATER RESOURCES et al., Defendants and Appellants.

478

[BLACK REDACTED BLOCKS]

## Counsel

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Tom Greene, Assistant Attorney General, Nancy Saracino and Martin Goyette, Deputy Attorneys General, for Defendants and Appellants.

Cooley Godward, Martin S. Schenker, Lori R.E. Ploeger, James C. Maroulis, Maureen P. Alger; Roger J. Peters, Robert L. Bordon and Christopher J. Warner for Plaintiff and Respondent.

## Opinion

**SIMS, J.**—The Pacific Gas and Electric Company (PG&E) buys electric power from the California Department of Water Resources.

The Department of Water Resources and its director, Thomas M. Hannigan (collectively DWR), appeal from a judgment granting a petition for writ of mandate filed by PG&E. PG&E challenged the manner in which DWR carried out emergency legislation authorizing it to buy and sell electrical power during a statewide energy crisis. The legislation at issue is Assembly Bill No. 1X (2001–2002 1st Ex. Sess.) (Assem. Bill No. 1X) (see Stats. 2001, 1st Ex. Sess., ch. 4, § 4), amended by Senate Bill No. 31X, (2001–2002 1st Ex. Sess.) (Sen. Bill No. 31X) (see Stats. 2001, 1st Ex. Sess., ch. 9), codified at Water Code section 80000 et seq.[1] Assembly Bill No. 1X authorizes DWR to recover its costs by submitting a "revenue requirement" to the California Public Utilities Commission (CPUC) for incorporation into utility rates. (§§ 80110, 80134.)

The trial court concluded (1) section 80110 required DWR to conduct a review to determine whether the costs to be included in its revenue requirement were just and reasonable, and (2) the review had to be conducted pursuant to the administrative procedures of the Administrative Procedure Act

---

[1] Undesignated statutory references are to the Water Code.

(APA), Government Code section 11340 et seq. Since DWR failed to follow APA procedures, the trial court granted PG&E's writ petition on that procedural basis and did not resolve PG&E's substantive challenge to the revenue requirement.

On appeal, DWR contends Assembly Bill No. 1X does not require DWR to conduct any just-and-reasonable review of its revenue requirement. DWR also contends that, even if a review is required, the APA procedures do not apply.

We shall conclude Assembly Bill No. 1X does require DWR to make a determination that its revenue requirement is just and reasonable, but neither Assembly Bill No. 1X nor the APA requires a public hearing or compliance with APA procedures. We shall therefore affirm the judgment insofar as it requires a just-and-reasonable determination by DWR, and we shall reverse the judgment insofar as it requires an APA hearing.[2]

We caution, however, that in concluding the revenue requirement is subject to a just-and-reasonable determination, we do not endorse PG&E's position that it would be unjust and unreasonable for DWR to include in its revenue requirement inflated prices DWR was forced to pay by energy suppliers engaged in alleged market manipulation. The question whether such payments (if they occurred) should be considered unjust and unreasonable in connection with DWR's revenue requirement is not before us, and we express no view on it.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

On January 17, 2001, the Governor declared a state of emergency with respect to energy in California, stating in a proclamation that "shortages of electricity available to California's utilities have today resulted in blackouts affecting millions of Californians," and "unanticipated and dramatic increases in the price of electricity have threatened the solvency of California's major public utilities, preventing them from continuing to acquire and provide electricity sufficient to meet California's energy needs," and "the imminent

---

[2] We granted DWR's motion for judicial notice of a related case pending in the trial court in which PG&E challenges a subsequent revenue requirement of DWR.

In this appeal, DWR does not challenge the trial court's determination that PG&E has standing to pursue this litigation. We therefore treat PG&E as having standing for purposes of this appeal.

[3] We hereby grant PG&E's February 7, 2003, unopposed motion to correct/augment the record with a copy of a complaint filed with the Federal Energy Regulatory Commission (FERC) by the State of California Electricity Oversight Board (EOB) on February 25, 2002, in which the state seeks to reform or abrogate DWR's power contracts due to alleged market abuse by suppliers.

threat of widespread and prolonged disruption of electrical power to California's emergency services, law enforcement, schools, hospitals, homes, businesses and agriculture constitutes a condition of extreme peril to the safety of persons and property within the state . . . ." The proclamation ordered DWR to enter into contracts for the purchase and sale of electric power as expeditiously as possible. Emergency legislation authorized DWR to purchase and sell electricity for 12 days. (Stats. 2001, 1st Ex. Sess., ch. 3; Sen. Bill No. 7X (2001–2002 1st Ex. Sess.) (Sen. Bill No. 7X).)

The Legislature thereafter enacted Assembly Bill No. 1X, which took effect on February 1, 2001, pursuant to a declaration of urgency. (Stats. 2001, 1st Ex. Sess., ch. 4, § 4.) The Legislative Counsel's Digest summarizes:

"Under existing law relating to the Central Valley Project, [DWR] has the authority to fix and establish the prices, rates, and charges at which the resources and facilities made available by the project are sold and disposed of, and to enter into contracts and agreements and do any and all things that [DWR] determines to be necessary, convenient, or expedient for the accomplishment of the purposes and objectives of that existing law.

"This bill would authorize [DWR] to enter into contracts for the purchase of electric power. The bill would authorize [DWR] to sell power to retail end use customers and, with specified exceptions, to local publicly owned electric utilities at not more than [DWR's] acquisition costs, as specified. The bill would prohibit [DWR] from contracting for the purchase of electric power on and after January 2, 2003.[4] . . .

"The bill would authorize [DWR] to issue revenue bonds not to exceed a certain amount, containing specified terms and conditions, upon authorization by written determination of [DWR] and with the approval of the Director of Finance and the Treasurer, as specified.

"The bill would establish in the State Treasury the Department of Water Resources Electric Power Fund, to be continuously appropriated to [DWR], and available for the purposes described above. The bill would require all revenues payable to [DWR] under the bill to be deposited in the fund. The bill would require that payments from the fund be made only for certain purposes. The bill would transfer $495,755,000 from the General Fund to the fund for the purposes described above and require repayment to the General Fund at the earliest possible time. The bill would appropriate $4,245,000 to

---

[4] However, DWR retains authority after that date pursuant to section 80260, which states: "On and after January 1, 2003, [DWR] shall not contract under this division for the purchase of electrical power. This section does not affect the authority of [DWR] to administer contracts entered into prior to that date or the department's authority to sell electricity."

[DWR] for the 2000–01 fiscal year for administrative cost incurred by [DWR] for purposes of the bill. The bill would permit the Department of Finance to authorize the creation of deficiencies for this appropriation.

"This bill would require California Public Utilities Commission [CPUC] to calculate the California Procurement Adjustment[5] and would further require the commission to determine the amount of the adjustment payable to [DWR] for deposit into the fund.

"The bill would require the Bureau of State Audits to conduct a financial and performance audit of [DWR's] implementation of the bill." (Legis. Counsel's Dig., Assem. Bill No. 1X, Stats. 2001–2002, 1st Ex. Sess., ch. 4.)

Subsequent legislation made amendments. (Stats. 2001, 1st Ex. Sess., ch. 9; Sen. Bill No. 31X, eff. Aug. 13, 2001.)

Assembly Bill No. 1X established the "revenue requirement" as the funding mechanism for DWR to recover its costs. (§§ 80110, 80134.) Section 80134[6] requires DWR to establish and revise revenue requirements sufficient to pay for specified categories, i.e., principal and interest on bonds, power purchases by DWR, the pooled money investment rate on funds advanced for

---

[5] The California Procurement Adjustment is "that portion of each existing electrical corporation's retail rate effective on January 5, 2001, that is equal to the difference between the generation related component of the retail rate and the sum of the costs of the utility's own generation, qualifying facility contracts, existing bilateral contracts, and ancillary services." (Pub. Util. Code, § 360.5.)

[6] Section 80134 provides: "(a) The department shall, and in any obligation entered into pursuant to this division may covenant to, at least annually, and more frequently as required, establish and revise revenue requirements sufficient, together with any moneys on deposit in the fund, to provide all of the following:

"(1) The amounts necessary to pay the principal of and premium, if any, and interest on all bonds as and when the same shall become due.

"(2) The amounts necessary to pay for power purchased by it and to deliver it to purchasers, including the cost of electric power and transmission, scheduling, and other related expenses incurred by the department, or to make payments under any other contracts, agreements, or obligations entered into by it pursuant hereto, in the amounts and at the times the same shall become due.

"(3) Reserves in such amount as may be determined by the department from time to time to be necessary or desirable.

"(4) The pooled money investment rate on funds advanced for electric power purchases prior to the receipt of payment for those purchases by the purchasing entity.

"(5) Repayment to the General Fund of appropriations made to the fund pursuant hereto and hereafter for purposes of this division, appropriations made to the [DWR] Electric Power Fund, and General Fund moneys expended by the department pursuant to the Governor's Emergency Proclamation dated January 17, 2001.

"(6) The administrative costs of the department incurred in administering this division.

"(b) The department shall notify the commission of its revenue requirement pursuant to Section 80110."

electric power purchases, necessary reserves, reimbursements to the General Fund, and administrative costs.

DWR submitted its revenue requirements to CPUC, which incorporated them into the utility rates fixed by CPUC. (Cal. Const., art. XII, § 6 ["The commission may fix rates . . . ."]; Pub. Util. Code, § 360.5, [see fn. 24, *post*]; *id.*, § 366.2, [see fn. 25, *post*].)

The crux of this litigation involves section 80110 (fn. 24, *post*), which provides that "[CPUC's] authority as set forth in Section 451[7] of the Public Utilities Code shall apply, *except any just and reasonable review under Section 451 shall be conducted and determined by [DWR] . . . ."* (Italics added.)

DWR first calculated its revenue requirement in May 2001, and then subsequently revised it in July 2001. Each submission contained DWR's assertion that "[DWR] has determined that these revenue requirements are just and reasonable."

On July 24, 2001, CPUC issued a "Joint Assigned Commissioners' Ruling Soliciting Comments on [DWR] Submittal," which stated in part: "This ruling asks DWR to provide additional information . . . so that the Revised Revenue Requirement can be properly understood and integrated into the rates approved by [CPUC] . . . ." The CPUC ruling further invited parties to attend a technical workshop on July 27, 2001, which would provide an opportunity for parties to ask questions of DWR representatives to assist in understanding the derivation and inputs underlying DWR's revenue requirement assumptions. Parties could then submit comments to CPUC concerning DWR's revised revenue requirement.

Also on July 24, 2001, PG&E wrote to DWR demanding a public hearing on the question whether the revenue requirement was just and reasonable.

---

[7] Public Utilities Code section 451 provides: "All charges demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful.

"Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

"All rules made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable."

PG&E asserted (incorrectly) that Public Utilities Code section 454[8] requires a public hearing when CPUC makes a just-and-reasonable determination under Public Utilities Code section 451, and therefore DWR should be required to conduct such a hearing.[9]

Subsequent correspondence from DWR to CPUC in August 2001 reflects DWR's position that it was not required to conduct a hearing, but that it had voluntarily participated in the public workshop conducted by CPUC on July 27, 2001, which included discussion of DWR's revenue requirement, and DWR responded to questions and comments raised at and after the workshop. In response to comments concerning the need for hearings under Public Utilities Code section 454, DWR asserted the provision applied "only to certain proceedings before [CPUC] relating to electrical corporations" and did not apply to DWR, which had the "absolute right" to recover its revenue requirement.

On August 21, 2001, PG&E filed in the trial court its original mandamus petition challenging the revenue requirement.

Thereafter, DWR revised its revenue requirement on November 5, 2001, and PG&E amended its pleading to challenge the November 2001 revenue requirement, which is the subject of this appeal. In its November 2001 revised revenue requirement, DWR stated "[DWR] has determined that the revenue requirements contained in the enclosed Determination are just and reasonable." The November 2001 revised revenue requirement, which covered 2001 and 2002, imposed a total revenue requirement of over $10 billion (which constituted a reduction from the previous revenue requirement). The

---

[8] Public Utilities Code section 454, which pertains to rate *change* proposals, does not require a hearing but leaves it up to CPUC's discretion; the statute states in part: "(a) . . . [N]o public utility shall change any rate or so alter any classification, contract, practice, or rule as to result in any new rate, except upon a showing before [CPUC] and a finding by [CPUC] that the new rate is justified. . . . [T]he corporation [seeking the adjustment] shall furnish to its customers affected by the proposed rate change notice of its application to [CPUC] for approval of the new rate. . . .

"(b) [CPUC] may adopt rules it considers reasonable and proper for each class of public utility providing for the nature of the showing required to be made in support of proposed rate changes, the form and manner of the presentation of the showing, *with or without a hearing*, and the procedure to be followed in the consideration thereof. . . .

"(c) [CPUC] shall permit individual public utility customers and subscribers affected by a proposed rate change, and organizations formed to represent their interests, to testify at any hearing on the proposed rate change, except that the presiding officer need not allow repetitive or irrelevant testimony and may conduct the hearing in an efficient manner." (Italics added.)

[9] Although PG&E also invoked the APA, it invoked the *adjudicative* hearing provisions of the APA, in contrast to its position in this litigation invoking an APA hearing for the quasi-legislative action of regulation making.

documentation submitted by DWR to CPUC included a three-page notification of revised revenue requirement, a 30-page explanation of the determination, and a 38-page appendix.

Pursuant to statutory mandate for an audit (§ 80270),[10] the State Auditor issued an extensive report in December 2001, titled: California Energy Markets: *Pressures Have Eased, but Cost Risks Remain.* As reflected in the audit's summary, DWR entered into 55 long-term contracts and two agreements in principle to meet a portion of its net short obligations. These contracts had terms ranging from a few months to as long as 20 years and could cost ratepayers of the investor-owned utilities up to $42.6 billion over the 10-year period ending December 31, 2010. The "[a]udit [h]ighlights" include the following: "The speed in which [DWR] entered into contracts in response to the crisis precluded the planning necessary for a power-purchasing program of this size. As a result, it assembled a portfolio of power contracts that presents significant risks that will need careful management to avoid increased costs to consumers." (Italics omitted.)

On February 22, 2002, CPUC issued a *Cost Recovery Decision* (Dec. No. D0202052) establishing utility charges incorporating DWR's November 2001 revenue requirement. The cost recovery decision specified, "the Legislature has expressly committed the determination of whether DWR's power procurement costs are just and reasonable to DWR, and not to [CPUC]. Accordingly, determination of the justness and reasonableness of DWR's total costs under [Public Utilities Code] Section 451 is beyond the scope of this order. We make no independent verification as to whether each cost element of Water Code Section 80100 has been appropriately considered by DWR."[11]

Also on February 22, 2002, CPUC issued a *Rate Agreement Decision* (Dec. No. D0202051) establishing a structure for the adoption of future revisions of the revenue requirement, so DWR could issue long-term bonds. The *Rate Agreement Decision* specified that, pursuant to Assembly Bill No. 1X, DWR had "exclusive authority to conduct any review of the justness and reasonableness of the costs it seeks to recover in electric rates under [Public Utilities Code section] 451."[12] The *Rate Agreement Decision* requires DWR to participate in CPUC proceedings at CPUC's request.

---

[10] Section 80270 provides: "The Bureau of State Audits shall conduct a financial and performance audit of the department's implementation of this division. The audit shall be completed before December 31, 2001. The bureau shall issue a final report on or before March 31, 2003."

[11] CPUC's *Cost Recovery Decision* nevertheless noted parties had raised a number of "valid concerns" about the revenue requirement.

[12] PG&E claims CPUC rejected a previous DWR request for rate agreement, in part because of DWR's failure to hold public hearings on reasonableness of its power contracts. However, the pages of the record cited by PG&E do not support PG&E's assertion.

PG&E sought rehearing of CPUC's *Cost Recovery Decision* on the grounds that DWR's revenue requirement was procedurally defective and was excessive. CPUC presumably denied rehearing, and there is no indication that PG&E ever sought writ review of CPUC's action in the California Supreme Court, as authorized by Public Utilities Code section 1768.[13]

This appeal involves PG&E's amended petition for writ of mandate (Code Civ. Proc., § 1085), writ of administrative mandamus (Code Civ. Proc., § 1094.5), and complaint for declaratory relief, to contest the November 2001 revised revenue requirement. The pleading alleged the revenue requirement was defective because DWR had failed to comply with APA procedures for administrative regulations, and because there was no evidentiary support for DWR's determination that the revenue requirement was just and reasonable. It is PG&E's position that any unreasonable costs in DWR's revenue requirement could be corrected by future changes to utility rates that would compensate for (or "true up") the previous overstated revenue requirement.

It is apparent from PG&E's pleading and briefing that PG&E assumes an attack on the revenue requirement opens up for attack the underlying power contracts DWR entered with energy suppliers, which are the focus of PG&E's case.[14] PG&E's mandate petition alleged DWR refused to provide for public review of the terms and reasonableness of the underlying power contracts. The pleading also alleged: "The analysis of the reasonableness of those contracts is central to any determination of the justness and reasonableness of the revenue requirement. Yet DWR limited its exchange with the public to nothing more than a discussion of the arithmetic calculation of the revenue requirement in its computer model. DWR continued and continues to refuse to provide information regarding the nature of its power procurement process, the reasonableness of its power contracts or the state officials—and their financial holdings—who negotiated them." PG&E's complaint alleged DWR, in determining reasonableness of its revenue requirement, failed to provide "any information regarding bidding practices, procurement controls or protocols, or comparative analysis of DWR's costs and revenue requirements

---

[13] DWR's appellate brief says CPUC denied PG&E's petition for rehearing, but the portion of the record cited by DWR contains a CPUC order dated August 2001, which predates the rehearing petition. PG&E's brief does not acknowledge that it requested rehearing.

[14] The posture of this appeal does not require us to answer that question, and we express no view on it. We note PG&E appears to assume DWR could unilaterally reform those underlying power contracts if an APA hearing showed those contracts were bad deals from the perspective of California energy consumers. PG&E's pleading did not seek to invalidate the underlying power contracts, nor did PG&E join as parties the suppliers who entered the underlying power contracts with DWR. PG&E's pleading sought to require DWR to withdraw its just-and-reasonable determination and take no further action pursuant to its revenue requirement until it complied with the APA.

based on market benchmarks or other objective criteria or standards."[15] PG&E's pleading sought a writ of administrative mandamus because "(i) [DWR] failed [to provide a hearing]; (ii) its determination that the revenue requirement is 'just and reasonable' is not supported by the findings, as DWR neither explained why this revenue requirement is 'just and reasonable' nor made any findings of fact concerning the reasonableness of its power costs or the negotiation and procurement of its power contracts; (iii) there is no evidence concerning the nature of DWR's negotiations regarding many of its power contracts, the process by which these contracts were awarded, or evidence to support DWR's determination that the contracts were 'just' or 'reasonable', and evidence outside the record shows that DWR's overall power costs, many of DWR's power contracts and the November 5 revenue requirement are neither just nor reasonable." PG&E alleged unreasonableness of the power contracts was shown by the fact that the State filed complaints with the FERC, asserting suppliers had overcharged for power. PG&E also alleged DWR had been accused of buying power from preferred sellers despite availability of less expensive power elsewhere.

PG&E also alleged: "In addition, several of the calculations contained in the revenue requirement are unreasonable on their face. For example, DWR states in its November 5 revenue requirement that its cost for certain short term power purchases averaged $117 per megawatt hour in the third quarter of 2001, despite the fact that [FERC] issued a price mitigation order in June 2001 that limited such short term energy prices to well under $100 per megawatt hour."

Thus, the thrust of PG&E's complaint related to DWR's purchase of power.

The relief sought by PG&E's pleading was a mandate requiring DWR (1) to withdraw its determination that its revenue requirement was just and reasonable, and (2) to take no further action on the November 2001 revenue requirement until DWR complied with the APA by conducting a full and fair public hearing as to whether its proposed revenue requirement was just and reasonable. PG&E also sought a judicial declaration invalidating DWR's determination that its November 2001 revenue requirement was just and reasonable.

DWR filed a demurrer, arguing (1) PG&E lacked standing; (2) section 80110 did not require DWR to conduct a just-and-reasonable review of the

---

[15] Section 80014 states the provisions of the Government Code and Public Contract Code applicable to state contracts, including competitive bidding requirements, apply to contracts entered into under Assembly Bill No. 1X, "[u]nless [DWR] determines that application of any such provision to such contracts is detrimental to accomplishing the purposes of this division . . . ."

revenue requirement; and (3) APA procedures did not apply. The trial court overruled the demurrer.[16] DWR challenges this ruling on appeal.

DWR filed a motion for judgment on the pleadings, arguing CPUC had incorporated the revenue requirement in its utility rates, and this mandamus petition was preempted by a Public Utilities Code provision which precludes the trial court from reviewing any CPUC order.[17] The trial court denied the motion for judgment on the pleadings, concluding this case did not require the court to review any CPUC decision, because CPUC specified it had merely accepted DWR's revenue requirement, as it was required to do by Assembly Bill No. 1X, without making any independent conclusions about whether the revenue requirement was just and reasonable. DWR unsuccessfully sought writ review of the denial of its motion in this court and in the Supreme Court.[18]

The case proceeded to a hearing in the trial court. PG&E asserted that if it succeeded on the merits, the court decision would not affect CPUC's previous actions incorporating the November 2001 revenue requirement, because CPUC would likely deal with any revised revenue requirement as a "true up" in the future.

In May 2002, the trial court granted PG&E's writ petition in part. The court concluded DWR's determination of its revenue requirement was a quasi-legislative act subject to review under Code of Civil Procedure section 1085. The court concluded section 80110's reference to "any just and reasonable" review triggered the APA protections,[19] and DWR failed to follow the APA procedures in reaching its just-and-reasonable determination in connection with its 2001–2002 revenue requirements. In light of its conclusion that DWR had failed to comply with necessary procedures, the

---

[16] The ruling on demurrer merely concluded the APA applied and did not indicate whether section 80110 required a just-and-reasonable review.

[17] The parties cite Public Utilities Code section 1759, which confers jurisdiction in the Supreme Court and Courts of Appeal, but this case would appear to be controlled by the more specific provision of Public Utilities Code section 1768 (fn. 21, *post*), which expressly establishes the procedure for judicial review of CPUC decisions *involving Assembly Bill No. 1X*; that procedure calls for direct petition to the California Supreme Court.

[18] DWR states that, in this appeal, it is not seeking review of the trial court's denial of the motion for judgment on the pleadings.

[19] The court's reasoning, as reflected in its written tentative ruling, was that the just-and-reasonable determination was a quasi-legislative action and/or a "regulation," both of which require compliance with the APA procedures. Although rate setting is expressly exempt under the APA (as we discuss, *post*), the court said only CPUC can set utility rates, and therefore DWR's determination of the revenue requirement could not be considered rate setting.

trial court did not address PG&E's contention that DWR's determination was arbitrary, capricious and devoid of evidentiary support.[20]

On June 7, 2002, the trial court ordered issuance of a peremptory writ of mandate commanding DWR to follow the APA procedures in connection with any just and reasonable determination of its 2001–2002 revenue requirement. The court specified its ruling did not affect any action by CPUC, including the enforcement and collection of existing rates and charges established by the CPUC decisions issued on February 21, 2002.

DWR appeals from the June 2002 judgment granting the writ of mandate.

## DISCUSSION

### I. *Jurisdiction of Trial Court and of the Court of Appeal*

Public Utilities Code section 1768[21] provides that only the California Supreme Court has jurisdiction to review CPUC orders or decisions applying Assembly Bill No. 1X.

PG&E contends it is not seeking review of any CPUC order or decision. DWR makes no contention to the contrary. As noted, DWR filed a motion for judgment on the pleadings arguing that the instant mandamus petition was preempted by provisions of the Public Utilities Code. (See fn. 17, *ante.*) However, in this court, DWR states it is not seeking review of its motion for judgment on the pleadings and makes no contention that the trial court lacked jurisdiction to entertain the instant dispute.

We will not assume the trial court lacked jurisdiction. "On appeal a judgment or order of the trial court is presumed correct. All intendments and

---

[20] The judgment, captioned, "Judgment Granting Writ of Mandate" did not directly address the prayer in the declaratory relief action for a declaration invalidating DWR's prior determination that its revenue requirement was just and reasonable. Instead, the judgment stated the court affirmed its written tentative ruling, and the tentative ruling said, "Pursuant to Water Code section 80110, DWR is directed to determine whether the proposed costs are 'just and reasonable.'"

[21] Public Utilities Code section 1768 provides in part: "The following procedures shall apply to judicial review of an order or decision of [CPUC] interpreting, implementing, or applying the provisions of Chapter 4 of the Statutes of 2001–02 First Extraordinary Session:

"(a) Within 30 days after the commission issues its order or decision denying the application for a rehearing, or, if the application is granted, then within 30 days after the commission issues its decision on rehearing, any aggrieved party may petition for a writ of review in the California Supreme Court for the purpose of determining the lawfulness of the original order or decision or of the order or decision on rehearing. . . . No order of [CPUC] interpreting, implementing, or applying the provisions of Chapter 4 of the Statutes of 2001–02 First Extraordinary Session shall be subject to review in the courts of appeal."

presumptions are indulged in to support it on matters as to which the record is silent. The burden of affirmatively demonstrating error is on the appellant. This is a general principle of appellate practice as well as an ingredient of the constitutional doctrine of reversible error. [Citation.]" (*Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 971 [33 Cal.Rptr.2d 812].)

Similarly, no party objects to the jurisdiction of this court to adjudicate this appeal, and, in the circumstances, we shall do so.

II. *Standard of Review*

"In reviewing the trial court's ruling on a writ of mandate [under Code of Civil Procedure section 1085], the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence. This limitation, however, does not apply to resolution of questions of law where the facts are undisputed. In such cases, as in other instances involving matters of law, the appellate court is not bound by the trial court's decision, but may make its own determination. [Citation.]" (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 502 [2 Cal.Rptr.2d 50].)

III. *The Statutory Framework*

Section 80000 provides:

"The Legislature hereby finds and declares all of the following:

"(a) The furnishing of reliable reasonably priced electric service is essential for the safety, health, and well-being of the people of California. A number of factors have resulted in a rapid, unforeseen shortage of electric power and energy available in the state and rapid and substantial increases in wholesale energy costs and retail energy rates, with statewide impact, to such a degree that it constitutes an immediate peril to the health, safety, life and property of the inhabitants of the state, and the public interest, welfare, convenience and necessity require the state to participate in markets for the purchase and sale of power and energy.

"(b) In order for the department to adequately and expeditiously undertake and administer the critical responsibilities established in this division, it must be able to obtain, in a timely manner, additional and sufficient personnel with the requisite expertise and experience in energy marketing, energy scheduling, and accounting."

Section 80002.5 provides: "It is the intent of the Legislature that power acquired by the department under this division shall be sold to all retail end use customers being served by electrical corporations, and may be sold, to the extent practicable, as determined by the department, to those local publicly owned electric utilities requesting such power. Power sold by the department to retail end use customers shall be allocated pro rata among all classes of customers to the extent practicable."

Section 80003 provides: "(a) The development and operation of a program as provided in this division is in all respects for the welfare and the benefit of the people of the state, to protect the public peace, health, and safety, and constitutes an essential governmental purpose. [¶] (b) This division shall be construed in a manner so as to effectuate the purposes and objectives thereof."

Section 80012 authorizes DWR to "do those things necessary and authorized under [section 80100 et seq.] to make power available directly or indirectly to electric consumers in California."

Section 80014[22] authorizes DWR to adopt emergency regulations in accordance with the APA (no such regulation is at issue here) and further authorizes DWR to depart from state contract requirements of the Government Code and Public Contract Code.

Section 80100 provides: "Upon those terms, limitations, and conditions as it prescribes, [DWR] may contract with any person, local publicly owned electric utility, or other entity for the purchase of power on such terms and for such periods as the department determines and at such prices the department deems appropriate taking into account" specified factors, including the intent to achieve reliable service at the lowest possible price and the desire to secure as much low-cost power as possible under contract.

---

[22] Section 80014 provides in part: "(a) The department and commission may adopt regulations for purposes of this division as emergency regulations in accordance with [the APA, which] shall be considered by the Office of Administrative Law to be necessary for the immediate preservations of the public peace, health and safety, and general welfare. Notwithstanding [the APA's 120-day restriction on emergency regulations], the regulations shall be repealed 180 days after their effective date, unless the adopting authority or agency complies with . . . Section 11346.1 of the Government Code [filing with Secretary of State].

"(b) Unless the department determines that application of any such provision to such contracts is detrimental to accomplishing the purposes of this division, the provisions of the Government Code and Public Contract Code applicable to state contracts, including, but not limited to, advertising and competitive bidding requirements and prompt payment requirements, apply to contracts entered into under this division."

Section 80102 provides that contracts for the purchase or sale of electric power are to contain any contractual and security provisions "as are determined by [DWR] to be necessary or appropriate."

Retail end-use customers must pay for power received from DWR. (§ 80104.)

The revenue requirement (which is described in § 80134, fn. 6, *ante*) is also addressed in section 80110,[23] which entitles DWR to recover "as a revenue requirement, amounts and at the times necessary to enable it to comply with Section 80134, and shall advise the commission as [DWR] determines to be appropriate. Such revenue requirements may also include any advances made to [DWR] hereunder or hereafter for purposes of this division, or from the Department of Water Resources Electric Power Fund, and General Fund moneys expended by [DWR] pursuant to the Governor's Emergency Proclamation dated January 17, 2001. For purposes of this division and except as otherwise provided in this section, the [CPUC's] authority as set forth in Section 451 of the Public Utilities Code (fn. 7, *ante*) shall apply, except *any just and reasonable review under Section 451 shall be conducted and determined by [DWR]*." (Italics added.)

---

[23] Section 80110 provides: "[DWR] shall retain title to all power sold by it to the retail end use customers. [DWR] shall be entitled to recover, *as a revenue requirement*, amounts and at the times necessary to enable it to comply with Section 80134, and shall advise [CPUC] as [DWR] determines to be appropriate. Such revenue requirements may also include any advances made to [DWR] hereunder or hereafter for purposes of this division, or from the Department of Water Resources Electric Power Fund, and General Fund moneys expended by [DWR] pursuant to the Governor's Emergency Proclamation dated January 17, 2001. For purposes of this division and except as otherwise provided in this section, [CPUC's] authority as set forth in Section 451 of the Public Utilities Code [fn. 7, *ante*] shall apply, except *any just and reasonable review under Section 451 shall be conducted and determined by the department.* The commission may enter into an agreement with the department with respect to charges under Section 451 for purposes of this division, and that agreement shall have the force and effect of a financing order adopted in accordance with Article 5.5 (commencing with Section 840) of Chapter 4 of Part 1 of Division 1 of the Public Utilities Code [financing of transition, i.e., generation-related, costs], as determined by the commission. In no case shall the commission increase the electricity charges in effect on the date that the act that adds this section becomes effective for residential customers for existing baseline quantities or usage by those customers of up to 130 percent of existing baseline quantities, until such time as [DWR] has recovered the costs of power it has procured for the electrical corporation's retail end use customers as provided in this division. After the passage of such period of time after the effective date of this section as shall be determined by the commission, the right of retail end use customers pursuant to Article 6 (commencing with Section 360) of Chapter 2.3 of Part 1 of Division 1 of the Public Utilities Code to acquire service from other providers shall be suspended until [DWR] no longer supplies power hereunder. [DWR] shall have the same rights with respect to the payment by retail end use customers for power sold by [DWR] as do providers of power to such customers." (Italics added.)

Section 80120 authorizes DWR to "fix and establish the procedure and charges for the sale or other disposal of power purchased by [DWR]."

Section 80200, subdivision (d), provides, "Obligations authorized by this division shall be payable solely from the fund [DWR Electric Power Fund]. Neither the full faith and credit nor the taxing power of the state are or may be pledged for any payment under any obligation authorized by this division."

As indicated, DWR submits its revenue requirement to CPUC, which incorporates it into the utility rates fixed by CPUC pursuant to its constitutional authority to set utility rates. (Cal. Const., art. XII, § 6 ["The commission may fix . . ."]; Pub. Util. Code, §§ 360.5,[24] 366.2.[25] ) CPUC's authority to set utility rates is addressed in Public Utilities Code section 360.5, which was enacted as part of Assembly Bill No. 1X (Stats. 2001, 1st Ex. Sess., ch. 4, § 2), and which provides CPUC "shall . . . determine the amount of the California Procurement Adjustment (fn. 5, *ante*) that is allocable to the power sold by [DWR]. That amount shall be payable, by each electrical corporation, upon receipt by the electrical corporation of the revenues from its retail end use customers, to [DWR] for deposit in the [DWR] Electric Power Fund, established by Section 80200 of the Water Code."

## IV. *Construction of Assembly Bill No. 1X*

DWR argues it was not statutorily required to make a determination that its revenue requirement was just and reasonable, and was not required to conduct any hearing concerning its revenue requirement. DWR argues section 80110 was intended to remove from CPUC's jurisdiction the right to conduct a reasonableness review of DWR's revenue requirement, but the Legislature did not intend to impose an affirmative obligation on DWR to conduct such a review itself. PG&E argues Assembly Bill No. 1X required DWR to conduct

---

[24] Public Utilities Code section 360.5 provides CPUC shall "determine the amount of the California Procurement Adjustment [the portion of the retail rate equal to the difference between the generation-related component of the retail rate and specified costs] that is allocable to the power sold by the department. That amount shall be payable, by each electrical corporation, upon receipt . . . from its retail end use customers, to the department for deposit in the [DWR] Electric Power Fund, established by Section 80200 of the Water Code."

[25] Public Utilities Code section 366.2, enacted in 2002 (Stats. 2002, ch. 838, § 4), provides in part: "(d)(1) It is the intent of the Legislature that each retail end-use customer that has purchased power from an electrical corporation on or after February 1, 2001, should bear a fair share of [DWR's] electricity purchase costs, as well as electricity purchase contract obligations incurred as of the effective date of the act adding this section, that are recoverable from electrical corporation customers in commission-approved rates. . . .

"(2) The Legislature finds and declares that this subdivision is consistent with the requirements of Division 27 (commencing with Section 80000) of the Water Code and Section 360.5, and is therefore declaratory of existing law."

a hearing concerning the justness and reasonableness of its revenue requirement, and the APA procedures apply.

We shall conclude Assembly Bill No. 1X requires that DWR's revenue requirement be just and reasonable, but the determination whether it is just and reasonable is to be made by DWR, and DWR is not required to conduct a hearing regarding its determination.[26]

## A. *Rules of Statutory Construction*

We recently summarized the rules of statutory construction in *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107 [113 Cal.Rptr.2d 90], as follows:

"The primary objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citation.] To do so, a court first examines the actual language of the statute, giving the words their ordinary, commonsense meaning. [Citation.] The statute's words generally provide the most reliable indicator of legislative intent; if they are clear and unambiguous, '[t]here is no need for judicial construction and a court may not indulge in it.' [Citation.] Accordingly, '[i]f there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.]

"Where, however, the statutory language is ambiguous on its face or is shown to have a latent ambiguity such that it does not provide a definitive answer, we may resort to extrinsic sources to determine legislative intent. [Citations.] Under this circumstance, 'the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes.' [Citation.] 'In such cases, a court may consider both the legislative history of the statute and the wider historical circumstances of its enactment to ascertain the legislative intent.' [Citation.]

"And a court may disregard the plain meaning of a statute and resort to its legislative history to aid in interpretation when applying the literal meaning of the statutory language 'would inevitably (1) produce absurd consequences which the Legislature clearly did not intend or (2) frustrate the manifest purposes which appear from the provisions of the legislation when considered as a whole in light of its legislative history. . . .' [Citation.] But '[i]f the legislative history gives rise to conflicting inferences as to the legislation's

---

[26] We need not address PG&E's cursory assertion that DWR should be estopped from denying the just-and-reasonable standard by contractual provisions of DWR's "Rate Agreement" with CPUC, assertedly acknowledging the standard.

purposes or intended consequences, then a departure from the clear language of the statute is unjustified. . . .' [Citation.]" (*Lewis v. County of Sacramento, supra*, 93 Cal.App.4th 107, 119–120.)

Another consideration where, as here, one of the parties is an administrative agency charged with enforcing the statute, is that " '[t]he standard for judicial review of agency interpretation of law is the independent judgment of the court, giving deference to the determination of the agency appropriate to the circumstances of the agency action.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

### B. *Section 80110*

The focus of this appeal is the following language of section 80110 (fn. 23, *ante*): "For purposes of this division and except as otherwise provided in this section, [CPUC's] authority as set forth in Section 451 of the Public Utilities Code shall apply, except any just and reasonable review under Section 451 shall be conducted and determined by the department."

DWR argues section 80110, read literally, does not require anyone to conduct a just-and-reasonable review, but merely provides that *if* any review occurs, it is to be conducted by DWR, not CPUC. We note that, in common usage, *any* means "without limit and no matter what kind." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934], citing Webster's New World Dict. (2d college ed. 1982) p. 62.)

To the extent DWR is arguing its revenue requirement need not be just and reasonable, we disagree. To the extent DWR is arguing that no *hearing* is required, we agree.

### 1. *Revenue Requirement Must Be Just and Reasonable*

DWR argues section 80110 does nothing more than exempt DWR from the just-and-reasonable review traditionally performed by CPUC.

However, section 80110 says Public Utilities Code section 451 (fn. 7, *ante*) "shall apply." As used in the Water Code, " 'shall' is mandatory . . . ." (§ 15.) Public Utilities Code section 451 must therefore be applied. That statute provides in pertinent part, "All charges demanded or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful."

 Because section 80110 mandates that Public Utilities Code section 451 "shall apply," and because the latter statute mandates that charges must be "just and reasonable," *somebody* must make a just-and-reasonable determination. Under section 80110, the only candidate is DWR. Section 80110 states CPUC's authority as set forth in Public Utilities Code section 451 shall apply, but then transfers the just-and-reasonable determination from CPUC to DWR. Public Utilities Code section 451 protects ratepayers from unjust and unreasonable charges, and section 80110 makes the just-and-reasonable standard applicable to DWR's revenue requirement, but to be determined by DWR, not CPUC.

We conclude section 80110 imposes the just-and-reasonable standard on DWR's revenue requirement.

DWR presents various arguments as to why the statute cannot be read to subject DWR's revenue requirement to a just-and-reasonable standard. None of these arguments has merit. Some of DWR's arguments are framed in terms of DWR's revenue requirement not being subject to *CPUC* review for justness/reasonableness. However, that is not what this case is about. This case is about whether *DWR* must make a determination that its revenue requirement is just and reasonable.

DWR argues the Legislature could not have intended to subject DWR's revenue requirement to a just-and-reasonable standard, because (1) Assembly Bill No. 1X requires that consumers of DWR power pay for the cost of acquisition; (2) Assembly Bill No. 1X specifies that the full faith and credit of the state could not be used to pay for DWR power purchases; (3) Assembly Bill No. 1X provides guidelines for DWR's power purchase program, obviating the need for a reasonableness review; and (4) Assembly Bill No. 1X and other provisions regarding governmental responsibility provide consumer protection. However, DWR ignores the language of section 80110 that the just-and-reasonable standard "shall apply." Application of such a standard is not inconsistent with the statutory scheme.

DWR says the legislative history illustrates the Legislature was concerned that a CPUC reasonableness review would impair DWR's ability to establish a diverse portfolio of energy resources. DWR quotes the following from a Senate Floor Analysis of Assembly Bill No. 1X: "The ability to enter into long-term power contracts is a critical and necessary component for the long-term rate stability in regional wholesale electricity markets. The limited authority of [investor-owned utilities (IOU's)] to enter into long-term contracts, and *the specter of after-the-fact reasonableness reviews by CPUC*, has caused IOUs to purchase a disproportionate amount of their needs in the spot market, which is the most expensive power available." (Italics added.) (Sen.

Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Assem. Bill No. 1X (2001–2002 1st Ex. Sess.) Jan. 18, 2001, p. 4.) DWR argues this concern about the "specter of after-the-fact reasonableness reviews" shows the Legislature did not want to impair DWR.

DWR also quotes the following from the Senate Republican Floor Commentaries: "In 2000, wholesale power prices skyrocketed far above [PG&E's and Southern California Edison's] customer rates, which remained frozen at 1996 rates, less 10 percent. Finally, the cost of natural gas soared by 200 percent from 1999 to 2001, further increasing their own power production costs and the wholesale price of electricity at the PX. In response, the PUC failed to act on their requests to enter long-term bilateral contracts and/or increase their rates. The result was an increasing inability to pay power purchase costs, aggravated by the 'risk premiums' exacted due to their financial condition and the threat of bankruptcy."[27] (Sen. Republican Floor Commentaries, Assem. Bill No. 1X (2001–2002 1st Ex. Sess.) Jan. 30, 2001, p. 4.) DWR argues the Legislature was concerned about DWR's ability to purchase sufficient power to stop the rolling blackouts, and therefore did not place cost constraints on DWR and exempted the revenue requirement from CPUC's just-and-reasonable review to avoid the uncertainty that would ensue if CPUC were to disallow DWR's costs.

However, none of DWR's arguments supports its ultimate position that its revenue requirement need not be just and reasonable. It is apparent that much of DWR's opposition to the just-and-reasonable standard is resistance to PG&E's assumption that it would be unjust and unreasonable for DWR to recover costs it paid as a result of alleged market manipulation by energy suppliers. DWR argues a just and reasonable review that would deny DWR recovery of such costs was not contemplated by the statutory scheme, which was established to deal with the energy crisis. However, as we said at the outset, our opinion should not be read as an endorsement of PG&E's position.[28]

---

[27] PG&E asserts it filed for chapter 11 bankruptcy protection on April 6, 2001.

[28] The posture of this appeal does not require us to resolve the parties' dispute as to what would happen if DWR were to decide it made a bad deal in executing underlying power contracts. DWR argues such a determination would expose taxpayers to liability for contract costs determined to be unreasonable, in contravention of Assembly Bill No. 1X's specification that the full faith and credit of the state cannot be used to back DWR's power purchases. PG&E responds there is no risk to taxpayers, because suppliers are charged with knowledge of the statutes limiting their recovery to monies in the Electric Power Fund, and the power contracts preclude suppliers from looking to the General Fund. DWR replies suppliers could gain access to bond charge revenues in the Electric Power Fund, compromising funds available to pay the bonds. These are policy arguments as to why the Legislature should have or should not have subjected DWR's revenue requirement to a just-and-reasonable standard. We have

DWR argues it does not make sense to say DWR must examine its own costs after the fact and perhaps decide that some of them should not be recoverable through the revenue requirement. However, in the very next breath, DWR admits it makes sense that DWR's revenue requirement should be based on reasonable assumptions about future costs and accurate data. Thus, DWR concedes there is room for a just-and-reasonable determination of its revenue requirement.

DWR argues the purpose of a just-and-reasonable standard is to control profits of IOUs, and that consideration is not present with DWR, because DWR is not making a profit but is merely recovering its costs. It is true that a return on investment is a factor when CPUC sets utility rates for IOUs. (*American Microsystems, Inc. v. City of Santa Clara* (1982) 137 Cal.App.3d 1037, 1042 [187 Cal.Rptr. 550]; *General Tel. Co. of Cal.* (1980) 4 Cal.P.U.C.2d 428, citing *Federal Power Com. et al. v. Hope Nat. Gas Co.* (1944) 320 U.S. 591, 605 [88 L.Ed. 333, 64 S.Ct. 281]; *Bluefield W. W. & Improv. Co. v. Pub. Service Com.* (1923) 262 U.S. 679, 692, 693 [67 L.Ed. 1176, 43 S.Ct. 675].)

However, " 'the primary purpose of the Public Utilities Act is to insure the public adequate service at reasonable rates without discrimination . . . .' " (*City and County of San Francisco v. Public Utilities Com.* (1971) 6 Cal.3d 119, 126 [98 Cal.Rptr. 286, 490 P.2d 798].) The goal of assuring reasonable rates for consumers applies, whether the provider is a profit-seeking IOU or the nonprofit DWR. The fact that profit is not at issue with DWR does not make it illogical to subject DWR's revenue requirement to a reasonableness standard. Hypothetically, corruption or incompetence could lead to unreasonable costs. Additionally, DWR's revenue requirement includes variable costs, such as "[r]eserves in such amount as may be determined by [DWR] to be necessary or desirable." (§ 80134, fn. 6, *ante.*) It is not illogical for the Legislature to command that these costs be just and reasonable.

DWR points out the Legislature has provided for oversight of DWR operations, by requiring DWR to make quarterly and annual reports to the Governor and Legislature (§ 80250) and by requiring the Bureau of State Audits to conduct a financial and performance audit of DWR's implementation of Assembly Bill No. 1X (§ 80270). DWR points out the audit bureau issued a lengthy report, with many suggestions and recommendations. However, the oversight provisions are not inconsistent with imposition of a just-and-reasonable standard on DWR's revenue requirement.

DWR argues the legislative history of Assembly Bill No. 1X supports DWR's interpretation that section 80110 was intended to eliminate CPUC

concluded the legislation subjects DWR's revenue requirement to a just-and-reasonable standard. The policy arguments are therefore without effect in this forum.

just-and-reasonable review without imposing an affirmative requirement on DWR. DWR points out an early version of Assembly Bill No. 1X imposed a cap on the price DWR could pay for power (5.5 cents per kilowatt hour), but the final version of Assembly Bill No. 1X removed the cap and instead directed DWR to contract for power "at such prices [DWR] deems appropriate," taking into account various factors.[29] However, removal of the cap does not reflect an intent to insulate DWR from a just-and-reasonable standard.

We conclude section 80110 requires DWR to make a determination that its revenue requirement is just and reasonable. This does not mean, however, that DWR was required to conduct a public hearing on the matter.

### 2. *Assembly Bill No. 1X Does Not Require DWR to Conduct a Hearing*

■ No Water Code provision expressly requires DWR to conduct a hearing concerning its revenue requirement. Assembly Bill No. 1X refers to Public Utilities Code section 451, which requires rates to be just and reasonable, but that statute on its face says nothing about a hearing. (Fn. 7, *ante.*)

We note the Public Utilities Code does not require CPUC to conduct public hearings concerning rates, but leaves the matter to CPUC's discretion. Thus, Public Utilities Code section 454[30] states in part: "(b) [CPUC] may adopt rules it considers reasonable and proper for each class of public utility providing for the nature of the showing required to be made in support of proposed rate changes, the form and manner of the presentation of the showing, *with or without a hearing*, and the procedure to be followed in the consideration thereof. . . ." (Italics added; see also Pub. Util. Code, § 1701.1 [CPUC, consistent with due process, public policy, and statutory requirements, shall determine whether a proceeding requires a hearing]; Pub. Util.

---

[29] DWR notes it achieved an overall portfolio cost of 6.9 cents per kilowatt hour for the energy purchased under its long-term energy contracts.

[30] Public Utilities Code section 454 states in part:

"(a) . . . [N]o public utility shall change any rate or so alter any classification, contract, practice, or rule as to result in any new rate, except upon a showing before [CPUC] and a finding by [CPUC] that the new rate is justified. . . . [T]he corporation [seeking the adjustment] shall furnish to its customers affected by the proposed rate change notice of its application to [CPUC] for approval of the new rate. . . .

"(b) [CPUC] may adopt rules it considers reasonable and proper for each class of public utility providing for the nature of the showing required to be made in support of proposed rate changes, the form and manner of the presentation of the showing, *with or without a hearing*, and the procedure to be followed in the consideration thereof. . . .

"(c) [CPUC] shall permit individual public utility customers and subscribers affected by a proposed rate change, and organizations formed to represent their interests, to testify at any hearing on the proposed rate change, except that the presiding officer need not allow repetitive or irrelevant testimony and may conduct the hearing in an efficient manner." (Italics added.)

Code, § 1701.3 [specifying procedures that apply "if" CPUC determines a ratesetting case requires a hearing.)

The California Supreme Court recently observed that Public Utilities Code section 454 does not require CPUC to hold a public hearing for rate change proposals. (*Southern Cal. Edison Co. v. Peevey* (2003) 31 Cal.4th 781 [3 Cal.Rptr.3d 703, 74 P.3d 795].) In that case, a utility company sued CPUC in federal court, alleging CPUC's regulation of rates violated federal law. The parties reached a settlement and proposed a stipulated judgment, which was opposed by an intervenor on the ground that CPUC's agreement to the settlement violated California law. After the district court entered the stipulated judgment, the Ninth Circuit Court of Appeals certified to the California Supreme Court three questions, including the following: "Does the stipulated judgment violate section 454 of the Public Utilities Code by altering utility rates without a public hearing and issuance of findings?" (*Id.* at p. 787.) The California Supreme Court answered, "No," stating, "Contrary to the premise of the certified question, section 454 [of the Public Utilities Code] does not require PUC to hold a 'public hearing' before allowing a change in rates. Indeed, the statute provides that PUC may adopt rules governing 'the nature of the showing required' and 'the form and manner of the presentation of the showing, *with or without a hearing.*' (§ 454, subd. (b), italics added; see also *Wood v. Public Utilities Com.* (1971) 4 Cal.3d 288, 292 [93 Cal.Rptr. 455, 481 P.2d 823] ['The Public Utility Code does not require public hearings before rate increases or rule changes resulting in rate increases may be authorized'].)" (*Southern Cal. Edison Co. v. Peevey, supra,* 31 Cal.4th at p. 804.) The Supreme Court went on to identify problems applying Public Utilities Code section 454 to a settlement agreement, as opposed to an application for a rate change, but concluded the settlement agreement affected no rate change subject to the statute. (*Southern Cal. Edison Co.,* at p. 804.)

█ Thus, the Water Code's incorporation of Public Utilities Code section 451 cannot be read to require DWR to conduct a hearing on the justness and reasonableness of its revenue requirement. The Water Code borrows the just-and-reasonable standard from the Public Utilities Code, but does not borrow or create any requirement of a hearing. Accordingly, section 80110's reference to "any such review" cannot be read as a statutory mandate requiring DWR to conduct a public hearing concerning the justness/reasonableness of its revenue requirement.

We conclude Assembly Bill No. 1X requires DWR to make a determination that its revenue requirement is just and reasonable, but Assembly Bill No. 1X does not compel DWR to conduct a hearing on its revenue requirement.

## V. *APA Procedures Not Required*

DWR argues the trial court erred in concluding the APA applied to the revenue requirement. PG&E argues the APA compels DWR to follow APA procedures for its revenue requirement, because DWR's revenue requirement is a quasi-legislative[31] act and a "regulation" under the APA, and the APA procedures apply to quasi-legislative acts and regulations. We shall conclude the revenue requirement is not a regulation for APA purposes.[32]

Before addressing the arguments about the revenue requirement as a "regulation," we first reject PG&E's position (which the trial court adopted) that, even if the revenue requirement is not a "regulation" under the APA, the revenue requirement is still subject to the APA procedures as a "quasi-legislative act." PG&E notes DWR itself characterized its action as "quasi-legislative." PG&E claims Government Code section 11346[33] makes the APA procedures applicable to the exercise of "any quasi-legislative power," and *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 575 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater*), supposedly holds the APA applies to *both* regulations and quasi-legislative acts.

However, in citing Government Code section 11346, PG&E omits the following italicized language: "*It is the purpose of this chapter to establish basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations.* Except as provided in Section 11346.1 [emergency regulations], the provisions of this chapter are applicable to the exercise of any quasi-legislative power conferred by any statute . . . ." Thus, the statute speaks of quasi-legislative power in the context of administrative regulations. Moreover, we see nothing in the cited case, *Tidewater, supra,* 14 Cal.4th 557, that is helpful to PG&E. *Tidewater* held a Division of Labor Standards Enforcement policy, intended as a rule of general application to guide deputy labor commissioners on the applicability of Industrial Wage

---

[31] Administrative action may be quasi-legislative, even though it involves fact finding. (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 278–279 [32 Cal.Rptr.2d 807, 878 P.2d 566].)

[32] PG&E argues in terms of whether "the just-and-reasonable determination" is subject to the APA, not whether the "revenue requirement" is subject to the APA. However, the justness/reasonableness of the revenue requirement is part and parcel of the revenue requirement.

[33] Government Code section 11346, provides in part: "(a) It is the purpose of this chapter to establish basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations. Except as provided in Section 11346.1 [emergency regulations], the provisions of this chapter are applicable to the exercise of any quasi-legislative power conferred by any statute heretofore or hereafter enacted, but nothing in this chapter repeals or diminishes additional requirements imposed by any statute. This chapter shall not be superseded or modified by any subsequent legislation except to the extent that the legislation shall do so expressly."

Commission wage orders to a particular type of employment and determining the scope of wage orders, was a "regulation" and therefore void for failure to follow APA procedures. In the part of the opinion cited by PG&E, *Tidewater* merely rejected an argument that the APA procedures apply only to the exercise of quasi-legislative power and therefore do not apply to interpretive regulations which are not quasi-legislative. (*Id.* at pp. 574–575.) *Tidewater* said interpretive regulations were essentially legislative in nature, and even if they were not, the APA makes its procedures applicable to any regulation and, while the APA states its procedures apply to the exercise of any quasi-legislative power, it does not state the opposite, i.e., that the procedures do *not* apply when an agency adopts rules that are *not* quasi-legislative. (*Ibid.*) PG&E fails to explain how its case is helped by *Tidewater*. On the other hand, *Faulkner v. California Toll Bridge Authority* (1953) 40 Cal.2d 317 [253 P.2d 659], which held resolutions approving construction of a bridge and authorizing issuance of bonds did not constitute regulations, said that since it determined the challenged administrative action did not fall within the APA definition of "regulation," it was unnecessary for the court to determine whether the action was an exercise of quasi-legislative power under the predecessor statute to Government Code section 11346. (*Id.* at p. 324.)

Thus, we see no basis for concluding, as urged by PG&E, that the revenue requirement is subject to APA procedures as a "quasi-legislative act" despite our conclusions (as we discuss *post*) that the revenue requirement is not a "regulation" subject to APA procedures.

### A. *DWR's Revenue Requirement Is Not a Regulation*

DWR argues the revenue requirement does not constitute a "regulation" under the APA. We agree.

Thus, Government Code section 11340.5, subdivision (a), provides: "No state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in Section 11342.600, unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State pursuant to this chapter."

Government Code section 11342.600 defines "[r]egulation" as "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure."

"The APA establishes the procedures by which state agencies may adopt regulations. The agency must give the public notice of its proposed regulatory

action (Gov. Code, §§ 11346.4, 11346.5); issue a complete text of the proposed regulation with a statement of the reasons for it (Gov. Code, § 11346.2, subds. (a),(b)); give interested parties an opportunity to comment on the proposed regulation (Gov. Code, § 11346.8); respond in writing to public comments (Gov. Code, §§ 11346.8, subd. (a); 11346.9); and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law (Gov. Code, § 11347.3 . . .), which reviews the regulation for consistency with the law, clarity, and necessity (Gov. Code, §§ 11349.1, 11349.3)." (*Tidewater, supra,* 14 Cal.4th 557, 568.)

"The APA is intended to advance 'meaningful public participation in the adoption of administrative regulations by state agencies' and create 'an administrative record assuring effective judicial review.' [Citation.] In order to carry out these dual objectives, the APA (1) establishes 'basic minimum procedural requirements for the adoption, amendment or repeal of administrative regulations' (Gov. Code, § 11346) which give 'interested parties an opportunity to present statements and arguments at the time and place specified in the notice and calls upon the agency to consider all relevant matter presented to it,' and (2) 'provides that any interested person may obtain a judicial declaration as to the validity of any regulation by bringing an action for declaratory relief in the superior court.' [Citation.]" (*Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 908–909 [54 Cal.Rptr.2d 225] [another statute will supplant or limit the APA when (1) the other statute was enacted after 1947, and (2) the other statute discloses an express intention to supplant or limit the APA].)

"A regulation subject to the APA thus has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's procedure.' " (*Tidewater, supra,* 14 Cal.4th 557, 571, citing predecessor statute to Gov. Code, § 11342.600.)

"Examples of policies that courts have held to be regulations subject to the rulemaking procedures of the APA include: (1) an informational 'bulletin' defining terms of art and establishing a rebuttable presumption (*Union of American Physicians & Dentists v. Kizer* [(1990) 223 Cal.App.3d 490, 501 [272 Cal.Rptr. 886]]); (2) a 'policy of choosing the most closely related classification' for determining prevailing wages for unclassified workers (*Division of Lab. Stds. Enforcement v. Ericsson Information Systems, Inc.* (1990) 221 Cal.App.3d 114, 128 [270 Cal.Rptr. 75]); and (3) a policy memorandum declaring that work performed outside one's job classification

does not count toward qualifying for a promotion (*Ligon* [*v. State Personnel Bd.* (1981) 123 Cal.App.3d 583, 588 [176 Cal.Rptr. 717]]). In contrast, examples of policies that courts have held not to be regulations include: (1) a Department of Justice checklist that officers use when administering an intoxilyzer test (*People v. French* (1978) 77 Cal.App.3d 511, 519 [143 Cal.Rptr. 782]); (2) the determination whether in a particular case an employer must pay employees whom it requires to be on its premises and on call, but whom it permits to sleep (*Aguilar* [*v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 25–28 [285 Cal.Rptr. 515]]); (3) a contractual pooling procedure whereby construction tax revenues are allocated among a county and its cities in the same ratio as sales tax revenues (*City of San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 375 [88 Cal.Rptr. 12]); and (4) resolutions approving construction of the Richmond-San Rafael Bridge and authorizing issuance of bonds (*Faulkner v. Cal. Toll Bridge Authority,* [*supra*, 40 Cal.2d at pp.] 323–324)." (*Tidewater, supra*, 14 Cal.4th 557, 571–572.)

In *City of San Joaquin v. State Bd. of Equalization, supra*, 9 Cal.App.3d 365, the Fifth Appellate District held the Board's pooling practice (a contractual pooling procedure whereby construction tax revenues were allocated among a county and its cities in the same ratio as sales tax revenues) was not an APA regulation, in part because it was "merely a statistical accounting technique to enable the Board to allocate, as expediently and economically as possible, to each city which had joined the uniform sales and use tax program, its fair share of sales taxes collected by the Board on that city's behalf." (*Id.* at p. 375.)[34]

Here, DWR's revenue requirement is an accounting exercise to calculate the amount of DWR's reimbursable costs for a finite period of time, for categories specified by the Legislature, including (as stated in § 80134, fn. 6,

---

[34] *City of San Joaquin v. State Bd. of Equalization, supra*, 9 Cal.App.3d 365, was criticized in *Grier v. Kizer* (1990) 219 Cal.App.3d 422, 437 [268 Cal.Rptr. 244], which held a statistical sampling and extrapolation method, applied by the Department of Health Services to audits of physicians making claims for treating Medi-Cal patients, was a regulation subject to APA procedures. *Grier* said the *City of San Joaquin* case appeared to have lost its precedential value because the Supreme Court subsequently recognized the distinction between purely internal rules which merely govern an agency's procedure and rules which have external impact so as to invoke the APA. (*Grier, supra,* at p. 437, citing *Armistead v. State Personnel Bd.* (1978) 22 Cal.3d 198 [149 Cal.Rptr. 1, 583 P.2d 744] [board policy concerning employee's withdrawal of resignation was invalid for failure to follow APA procedures].) However, *Grier* was discussing the "internal management" exception to the APA. (*Grier, supra,* 219 Cal.App.3d at pp. 435–436.) In contrast, *City of San Joaquin* was not applying any exemption, but rather concluded the pooling practice was not a regulation. (*City of San Joaquin, supra,* at p. 375.)

*Grier* was overruled on other grounds in *Tidewater, supra,* 14 Cal.4th 557, 577. Despite *Grier*'s criticism, *Tidewater, supra,* 14 Cal.4th at page 572, cited *City of San Joaquin* as an example of a policy found not to constitute a regulation.

*ante*) amounts necessary to cover the principal and interest on bonds, DWR's costs to purchase and deliver electric power, reserves and administrative costs, the pooled money investment rate on advanced funds, and repayment to the General Fund for appropriations made to the Electric Power Fund.

Also instructive is *Faulkner, supra,* 40 Cal.2d 317, which held resolutions of the California Toll Bridge Authority, approving a Department of Public Works recommendation to construct the Richmond-San Rafael Bridge and authorizing issuance of toll revenue bonds not exceeding a stated sum, did not constitute "regulations" under the APA, since they were not of general application adopted to implement the law, but related only to one particular bridge, and constituted steps in the performance of a statutory duty with respect to a specific project. (*Id.* at pp. 323–324.) *Faulkner* rejected an argument that the resolutions were of general application because the tolls to be collected on the bridge affected the public generally, and that the bonds to be issued may be purchased by anyone in the world. (*Id.* at p. 323.) The "application" related to only one particular bridge. (*Ibid.*)

As stated by DWR, the facts of this case are similar, in that DWR was authorized to undertake a substantial but limited task and to fund it by issuing bonds. (§ 80130.) Although DWR's revenue requirement involves a large sum, it concerns a discrete project, i.e., emergency power purchases. The determination of the revenue requirement—calculation of the amount of reimbursable costs designated by statute—constitutes compliance with the statutory mandate, rather than an attempt to interpret the statutes. While the statutes confer discretion on DWR, PG&E fails to show that any part of the revenue requirement creates a standard of general application. DWR further notes that all long-term contracts have been in place since 2001, DWR is statutorily precluded from entering any new power contracts (§ 80260), and there is no "open class" of future power purchase programs or long-term contracts, just as in *Faulkner* there was no "open class" of further bridges to be built.

PG&E argues this case is distinguishable from *Faulkner,* because DWR's determination involves a review of dozens of long-term contracts, creates a standard that DWR will repeatedly apply to these same contracts for purposes of calculating its revenue requirements for the next decade, and will determine the amount of DWR's power purchase costs that will be imposed on millions of California ratepayers. However, the standard was created by the Legislature, not by DWR.

Thus, this case does not fall within the rationale of the APA's purpose "to ensure that those persons or entities whom a regulation will affect have a voice in its creation [citation], as well as notice of the law's requirements so

that they can conform their conduct accordingly [citation]. The Legislature wisely perceived that the party subject to regulation is often in the best position, and has the greatest incentive, to inform the agency about possible unintended consequences of a proposed regulation. Moreover, public participation in the regulatory process directs the attention of agency policymakers to the public they serve, thus providing some security against bureaucratic tyranny. [Citation.]" (*Tidewater, supra*, 14 Cal.4th 557, 568–569.)

PG&E argues that, unlike the statute at issue in *Faulkner*, Assembly Bill No. 1X does not limit DWR to making a binary decision to approve or disapprove a project; rather, Assembly Bill No. 1X gives DWR discretion to determine the extent to which its revenue requirements are just and reasonable. PG&E concludes it is DWR's responsibility to implement, interpret, and make specific the law, and therefore the just-and-reasonable determination falls squarely within the APA's definition of regulation. However, contrary to PG&E's position, DWR's just-and-reasonable determination with respect to its revenue requirement does not constitute a standard of general application.

Other than citing the APA's statutory definition of "regulation" (Gov. Code, § 11342.600), PG&E cites no affirmative authority whatsoever in support of its argument that DWR's just-and-reasonable determination of its revenue requirement is a "regulation" subject to the APA. Elsewhere in its brief, PG&E maintains the legislative intent to apply the APA is shown by the fact that section 80014 authorizes DWR to adopt emergency regulations under the APA. However, the fact that Assembly Bill No. 1X authorizes DWR to adopt regulations under the APA does not mean that the revenue requirement constitutes such a regulation.

PG&E suggests DWR conceded the need for a just-and-reasonable hearing by making affirmative statements that its revenue requirement was "just and reasonable." We disagree. In *20th Century Insurance Co. v. Garamendi, supra*, 8 Cal.4th 216, the fact that the Insurance Commissioner had submitted rate regulations to the Office of Administrative Law (OAL) and had them rejected by OAL did not preclude the commissioner from invoking the ratesetting exemption. (*Id.* at pp. 248, 270.) The commissioner had voluntarily submitted the regulations to the OAL. Since the regulations were exempt, OAL approval was not required, and therefore OAL's disapproval did not render the regulations invalid. (*Ibid.*) Thus, we reject PG&E's attempt to use against DWR the affirmative statements by DWR that its revenue requirement was just and reasonable.

■ We conclude DWR's revenue requirement is not a "regulation" within the meaning of Government Code section 11342.600, and is therefore not subject to APA procedures. We therefore need not address the parties' arguments as to whether any exemption from the APA applies.

PG&E argues the absence of APA notice and hearing will leave the public uninformed about the process and therefore unable to challenge DWR's determination. We need not address the merits of any challenge but merely note PG&E states DWR provided a 20-volume, 6,087-page "Quasi-Legislative Record of Revenue Requirement Reasonableness Determination," which is on file in the trial court, but has not been made part of the record on appeal (which consists of over 4,300 pages), since this appeal involves only procedural, not substantive, issues. Additionally, DWR's actions are subject to public scrutiny because Assembly Bill No. 1X provides for audit of DWR's actions. (§ 80270; see fn. 10, *ante*.)

We conclude the judgment must be reversed in part because, contrary to the trial court's decision, DWR was not required to follow APA procedures in connection with its determination that its revenue requirement was just and reasonable.

At the end of its appellate brief, DWR asks that we order the case dismissed. However, there remains the matter of PG&E's substantive challenge to DWR's just-and-reasonable determination, which the trial court left unresolved due to the court's conclusion that the APA procedures applied. In the body of its brief, DWR asserts (under the heading that CPUC's actions support DWR's statutory construction) that CPUC has already addressed and resolved many of the substantive issues, as urged in DWR's unsuccessful motion for judgment on the pleadings. However, DWR expressly states on appeal that it is not challenging the trial court's denial of its motion for judgment on the pleadings. DWR has not developed on appeal any sort of authority or analysis supporting dismissal of this case. DWR merely cites statutory restrictions on judicial review of CPUC decisions. Moreover, DWR says CPUC has resolved "many" of the substantive issues, suggesting CPUC has not resolved all substantive issues. As noted by PG&E, CPUC has stated it lacks authority to review the justness and reasonableness of DWR's costs. We therefore have no basis upon which to order the case dismissed.

## DISPOSITION

To the extent the trial court concluded DWR was required to make a just-and-reasonable determination with respect to its revenue requirement, the judgment is affirmed. To the extent the trial court concluded an APA hearing was required, the judgment is reversed. The parties shall bear their own costs on this appeal. (Cal. Rules of Court, rule 27(a).)

Scotland, P. J., and Nicholson, J., concurred.