[No. C052373. Third Dist. May 17, 2010.]

CALIFORNIANS FOR PESTICIDE REFORM et al., Plaintiffs and Appellants, v.
DEPARTMENT OF PESTICIDE REGULATION et al., Defendants and Respondents.

COUNSEL

Michael W. Graf; Center on Race, Poverty & the Environment, Caroline Farrell and Alegria De La Cruz for Plaintiffs and Appellants.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Hackenbracht, Assistant Attorney General, John Davidson and Anita E. Ruud, Deputy Attorneys General, for Defendants and Respondents.

OPINION

RAYE, J.—In an effort to evaluate and control potentially hazardous air pollutants, the California Legislature enacted the Toxic Air Contaminants Act (Act), which labels such pollutants "toxic air contaminants" and imposes responsibilities for their identification and control. Under the Act, defendant Department of Pesticide Regulation (Department) is assigned responsibility for assessing the risks of pesticides and determining whether a pesticide

should be listed as a toxic air contaminant. The Department is also responsible for determining the need for and adopting measures necessary to control the pesticides that are determined to be toxic air contaminants.[1]

Plaintiff Californians for Pesticide Reform (Reform) challenges the Department's policy of prioritizing pesticides for risk assessment. Reform filed a petition for writ of mandate and complaint for declaratory relief requesting the court to set aside the Department's risk assessment process. The trial court denied the petition.

Reform appeals, contending the Department's process is contrary to the Act, the Department has failed to implement the Act, the process is an underground regulation, and the trial court erred in denying Reform's request for judicial notice. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

With the passage of the Act (Health & Saf. Code, § 39650 et seq.; see also Food & Agr. Code, § 14021 et seq.), the Legislature for the first time provided for the regulation of all airborne toxins, including pesticides that theretofore had not been subject to a comprehensive regulatory scheme. "Toxic air contaminant" (TAC) is the term used to describe the substances that are the Act's regulatory focus. A TAC is defined as an "air pollutant which may cause or contribute to an increase in mortality or in serious illness, or which may pose a present or potential hazard to human health." (Health & Saf. Code, § 39655, subd. (a); see Food & Agr. Code, § 14021, subd. (b).)[2] The California Air Resources Board (Board) is vested with responsibility for implementing the Act's requirements pertaining to nonpesticide TAC's. The Act vests authority over pesticide TAC's in the Department. (Health & Saf. Code, § 39655, subd. (a).)

Subdivision (a) of section 14022 requires the Department, in consultation with the Office of Environmental Health Hazard Assessment and the Board, to "evaluate the health effects of pesticides which may be or are emitted into the ambient air of California and which may be determined to be a toxic air contaminant which poses a present or potential hazard to human health." (§ 14022, subd. (a), as amended by Governor's Reorganization Plan No. 1 of 1991, § 57, eff. July 17, 1991; reprinted as mod. at Editor's Notes, Deering's Ann. Food & Agr. Code (1997 ed.) foll. § 14022, p. 292; Gov. Code, § 12081.)

---

[1] The Department's responsibilities are set forth in Food and Agricultural Code section 14021 et seq. In the interest of clarity, references to the Act herein include the relevant sections of the Food and Agricultural Code.

[2] All further statutory references are to the Food and Agricultural Code unless otherwise indicated.

There are hundreds of pesticides, and the list of pesticides that fall within the broad category described by subdivision (a) is quite long. In light of the extended amount of time required to perform an evaluation, the order in which pesticides are selected for evaluation assumes great importance.

■ The Act requires the Director of Pesticide Regulation (director) to evaluate a pesticide upon request of the Board. (§ 14022, subd. (a).)[3] Section 14021, subdivision (b) also specifies that pesticides identified as hazardous air pollutants pursuant to section 7412 of title 42 of the United States Code shall be identified by the director as TAC's, although the parties express divergent views on the Department's obligation to develop control measures for the pesticides (referred to as HAP-TAC's) included on the list of TAC's by virtue of this provision.

The Act offers only general guidance as to the order in which pesticides shall be evaluated. Subdivision (e) of section 14022 states: "The director shall give priority to the evaluation and regulation of substances based on factors related to the risk of harm to public health, amount or potential amount of emissions, manner of usage of the pesticide in California, persistence in the atmosphere, and ambient concentrations in the community." As hereafter discussed, much of the dispute between Reform and the Department concerns this section.

■ In evaluating a pesticide, the director is required to consider all available scientific data.[4] Upon the director's request, the Board is required to document the level of airborne emissions and the Office of Environmental Health Hazard Assessment (Office) must provide an assessment of related health effects. (§ 14022, subd. (c).) The Board and Office are the primary sources of information used in evaluating pesticides. In addition, subdivision (d) of section 14022 allows the director to request information from any person on any substance under evaluation and provides protection for information that may constitute trade secrets. Subdivision (b) of section 14022

---

[3] The Department notes that notwithstanding the Board's authority in the interest of health and safety to initiate a risk assessment of a particular pesticide, it has never done so, deferring instead to the Department's own timetable. Though not directly relevant to the resolution of issues raised by Reform, the Department also notes that the ability of state agencies to protect the public from known dangers of pesticide exposure is not constrained by the TAC risk assessment process; the Board's air monitoring is ongoing and the Department imposes control measures when health risks are identified.

[4] "[I]ncluding, but not limited to, relevant data provided by the [O]ffice, the Occupational Safety and Health Division of the Department of Industrial Relations, international and federal health agencies, private industry, academic researchers, and public health and environmental organizations." (§ 14022, subd. (c), as amended by Governor's Reorganization Plan No. 1 of 1991, § 57; reprinted as mod. at Editor's Notes, Deering's Ann. Food & Agr. Code, *supra*, foll. § 14022, p. 292.)

requires the director to evaluate the pesticide within 90 days after receiving scientific data from the Office and the Board, but permits extension of the deadline under specific circumstances.

After completion of the evaluation under section 14022, the director, in consultation with the Office, prepares a report "on the health effects of the pesticide which may be determined to be a toxic air contaminant which poses a present or potential hazard to human health due to airborne emission from its use." (§ 14023, subd. (a).) The content of the report is prescribed by statute.[5] The report must include the Office's findings and be made available to the public. (§ 14023, subd. (a).)

■ The report is formally reviewed by a scientific review panel (Panel) established pursuant to Health and Safety Code section 39670, which must submit its written findings to the director within 45 days after receiving the report. (Food & Agr. Code, § 14023, subd. (b).)

Subdivision (c) of section 14023 provides that if the Panel determines the health effects report is seriously deficient, the report will be returned to the director for revision. The director will resubmit the report, within 30 days following receipt of the Panel's determination, to the Panel prior to development of emission control measures.

Within 10 working days of receiving the Panel's findings, the director shall prepare a hearing notice and proposed regulation that includes the proposed determination as to whether a pesticide is a TAC. After the hearing, the director shall list, by regulation, pesticides determined to be TAC's. (§ 14023, subd. (d).)

■ Finally, the director, in consultation with the Board, the Office, and air pollution control or air quality management districts in the affected counties, shall determine the need for and appropriate degree of control measures for each pesticide listed as a TAC. (§ 14023, subd. (e).) The control measures are to be adopted as regulations. (§ 14024.)

*Compliance Efforts*

The Act was first enacted in 1983. Since its inception, only a handful of pesticides have undergone the full review process outlined in sections 14022

---

[5] "The report shall assess the availability and quality of data on health effects, including potency, mode of action, and other relevant biological factors, of the substance. The report shall also contain an estimate of the levels of exposure which may cause or contribute to adverse health effects and, in the case where there is no threshold of significant adverse health effects, the range of risk to humans, resulting from current or anticipated exposure." (§ 14023, subd. (a).)

and 14023. Over the years, in an effort to comply with subdivision (e) of section 14022, requiring the director to set priorities in the evaluation and regulation of potential TAC's, the Department has developed several priority lists. From the initial list of 14 pesticides in 1987, lists subsequently developed in 1989 and 1996 included as many as 134 pesticides. A 2002 draft prioritization was discussed but aborted because of budget cuts.

In September of 2004 the Department initiated a new prioritization process that took into account budget cuts and the Department's multiple risk assessment responsibilities.[6] Previous risk assessments evaluated all potential exposure routes for a single active ingredient and resulted in the generation of multiple documents for a given ingredient. The new process would result in a single risk assessment document for each active ingredient that considered all potential sources of exposure. A working group of scientists from various agencies, including the Office and the Board, was formed to develop and maintain a list of about 10 active ingredients prioritized for risk assessment initiation. The prioritization of 10 ingredients was chosen because it was greater than the number of new risk assessments that could be initiated in a two- or three-year period and would provide a sufficient pool of active ingredients. The process will be conducted annually in order to maintain a pool of about 10 ingredients. After risk assessment of an active ingredient is initiated, the ingredient is removed from the priority list and another ingredient is added.

The new prioritization process identified nine active ingredients for risk assessment initiation in 2004–2005. The Pesticide Registration Evaluation Committee (Committee) provided commentary on the list and included the commentary in a public notice that outlined the prioritization process, the data on the individual chemicals, and the list. Following release of the public notice, which invited comment, the Department received a series of comments, which it responded to in another public notice. The public notice also finalized the list of nine active ingredients, which contains five active ingredients for which ambient air concerns played a major role in prioritization.

The Department's prioritization process thus begins with an initial evaluation of pesticide active ingredients as possible TAC's. This preliminary evaluation is designed to produce a priority list of ingredients. While the Department acknowledges its duty to ultimately assess all pesticides that "may be determined to be a toxic air contaminant which poses a present or potential hazard to human health" (§ 14022, subd. (a)), it has assigned its highest priority to the review of pesticide ingredients that are likely to be listed as TAC's. A risk assessment is then conducted on the ingredients placed

---

[6] The Department is also mandated by the Birth Defect Prevention Act of 1984 to assess the risk of birth defects from pesticide exposure. (§ 13121 et seq.)

by the Department on the priority list. Following the risk assessment, a report with appropriate findings is prepared pursuant to section 14023, subdivision (a) for review by the public and the Panel. The Panel's findings then serve as the basis for a rulemaking that can lead to a regulation determining the pesticide to be a TAC.

Thereafter, the Department must determine the need for control measures and develop control measures as appropriate. (§ 14023, subd. (e).)

In 2005 the Department presented to the Panel an evaluation of the fumigant sulfuryl fluoride. The evaluation considered all potential sources of exposure, including ambient air exposures. The Panel accepted the new format. Also in 2005 the Department presented to the Committee a risk assessment of methidathion, the first step in sending the document to the Panel. The Department also released the assessment for public comment.

*The Lawsuit*

Reform filed a petition for writ of mandate and complaint for declaratory relief in which it asked the trial court to set aside the Department's new risk assessment process and to order the Department to comply with the Act.

Following oral argument, the trial court denied the petition. The court rejected Reform's contention that the Department unlawfully substituted its own prioritization process in place of the process mandated by the Act. The court reasoned the Department's new process was merely a method of prioritizing the order in which potential TAC's would be subjected to the evaluation process established under the Act. The court found the factors employed by the Department in establishing priorities for evaluation "not so different" from those promulgated under the Act.

The court also rejected Reform's argument that the prioritization process is contrary to the Act's requirement that all potential TAC's be subject to review. According to the court: "The statute does not give a specific time line for review of potential toxic air contaminants. Some prioritization in review is essential. The statutes and the documents submitted to the court demonstrate that this is a complicated process necessarily involving scientific expertise and research. Considering that plaintiffs/petitioners identified 133 potential TACs, it is not possible to subject each of them to this review at the same time." The court found the prioritization process neither unreasonable nor contrary to law.

The court concluded that the prioritization process did not violate the Act or eliminate review by the Panel. The court noted that Panel review occurs later in the process for pesticides that come up for review on the prioritization list. In addition, the court determined that the Act did not explicitly require a cumulative impacts analysis.

The court dismissed Reform's claim that the prioritization process contributed to further delay in assessing possible TAC's. The court noted the process might be slow, but it did not represent a complete failure to comply with the law justifying court intervention. Finally, the court denied Reform's request that the prioritization process be struck down as an underground regulation.

Reform filed a timely notice of appeal.

## DISCUSSION

### STANDARD OF REVIEW

Reform argues we should accord no deference to the Department's decision to implement its prioritization process. The Department contends administrative agency interpretations of statutes and regulations are accorded deference. Both parties cite *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).

In *Yamaha*, the Supreme Court noted the difference between the great deference given by courts to an administrative agency when it acts in a quasi-legislative capacity to promulgate regulations, and the lesser deference given when an agency interprets a statute. (*Yamaha, supra,* 19 Cal.4th at pp. 10–12.) As explained by the court, "An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Id.* at p. 7.)

We are concerned here with the Department's interpretation of a statute, not its rulemaking authority. The court in *Yamaha* explained when judicial deference to an agency's interpretation of a statute is appropriate and that, when appropriate, the weight it should be given is "situational." (*Yamaha, supra,* 19 Cal.4th at p. 12, italics omitted.) There are two broad categories of

factors relevant to a court's assessment of the weight to be given an agency's interpretation: those indicating the agency has a comparative interpretive advantage over the courts, and those indicating the interpretation is probably correct. (*Ibid.*)

Reform argues the present case implicates neither of these categories. We disagree.

The first category assumes the agency has expertise and technical knowledge, especially when the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion. (*Yamaha, supra,* 19 Cal.4th at p. 12.) In the present case, as the trial court sagely noted, "[t]he statutes and the documents submitted to the court demonstrate that this is a complicated process necessarily involving scientific expertise and research." Our review of the record supports the trial court's observation.

The Act requires the Department to evaluate and identify possible TAC's among over 100 pesticides. Any assessment of whether the Department's prioritization process complies with the Act requires familiarity with pesticides, TAC's, and risk evaluation. This expertise resides in the Department, and under *Yamaha*, we accord the Department's determinations on these issues some deference. However, to the extent our review involves basic questions of statutory and regulatory interpretation, we review those questions of law de novo. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10].)

## PRIORITIZATION PROCESS AND THE ACT

Reform argues the Department's new prioritization process runs afoul of the Act in four respects. First, the process applies an incorrect standard, " 'likely' to be listed as a TAC," in deciding the pesticides to be reviewed. Second, the process "falls short in critical procedural and substantive aspects." It mimics the statutorily required assessment process under section 14022 without the procedural and substantive requirements that accompany the statutory process. Third, the policy does not comport with subdivision (e) of section 14022, which requires the director in setting priorities to give special consideration to impacts peculiar to pesticide air pollution. Finally, the Department's process unnecessarily diverts resources from the assessment of numerous pesticides and results in delay.

### 1. *Establishing Priorities for Risk Assessment—The Standard*

Under the Department's procedures, the process of pesticide review begins with a preliminary evaluation of pesticides for risk assessment. Because it lacks the capacity to conduct a risk assessment of all pesticides at once, the Department must decide which of more than 100 pesticides will be placed at the head of the line for risk assessment. The preliminary evaluation conducted for this purpose includes identification of the active ingredients in pesticides that would be subject to a risk assessment. In assigning priorities for the assessment of such ingredients, the Department announced in its prioritization policy that it will look first at ingredients likely to be listed as TAC's. Once an ingredient is placed on the priority list, the Department proceeds to evaluate it in accordance with the procedures and consistent with the requirements of section 14023, as earlier discussed.

Reform challenges this initial prioritization of pesticides that precedes the preparation of a report on health effects for Panel review and the actions thereafter required for risk assessment and identification of a pesticide as a TAC.

Reform's arguments are hard to fathom. After more than 20 years, under various other priority schemes that went unchallenged, the Department barely managed a dent in assessing the risk of the many pesticides on the market. Faced with the practical reality that risk assessment takes time and it lacks the ability to assess the health risks of all pesticides immediately, the Department announced another effort to set priorities and to proceed first with those pesticide ingredients that would most likely meet the criteria for identification as TAC's.

According to Reform, the Act requires all pesticides be evaluated "which may be or are emitted into the ambient air . . . and which may be determined to be a toxic air contaminant . . . ." (§ 14022, subd. (a).) Thus, the Act requires all pesticides to be reviewed to determine if further regulation is necessary. On this point, there is no disagreement. The Department concedes that all pesticides must ultimately be reviewed to determine whether they qualify as TAC's. The Department has simply announced that it intends to assign a higher priority and first assess those pesticides with known properties that render them most likely to be TAC's. This would enable the Department to target pesticides most likely to pose a health risk and formulate suitable control measures earlier than it might if it chose to expend its limited resources on pesticides whose toxic properties are not as apparent.

Reform contends the Department's "likely to be" language is more restrictive than the statute's "may be" language. As Reform sees it, the Department's

"heightened threshold" to initiate review will allow it to make unreviewable determinations as to which pesticides will be considered. "The question whether a pesticide is 'likely' to pose a health hazard is a question to be resolved *through* the TAC process, not unilaterally in the discretion of the DPR Director." The simple answer to Reform's contention is that the decisive questions indeed will be resolved through the TAC process. To reiterate, the Department's prioritization policy answers the preliminary questions regarding the order in which pesticides are subjected to the TAC process. Of necessity, the Department must put some pesticides before others in the process. No pesticides are exempted.

■ Reform's arguments overlook the language of the Act itself. Section 14022, subdivision (e) states: "The director shall give priority to the evaluation and regulation of substances based on factors related to the risk of harm to public health, amount or potential amount of emissions, manner of usage of the pesticide . . . , persistence in the atmosphere, and ambient concentrations in the community." In requiring the Department to "give priority" based on specified factors, the Act contemplates the Department will put the evaluation of certain pesticides over others in an effort to evaluate the most potentially harmful pesticides before all others. The Act provides no time limits for evaluating pesticides, nor does it state how many pesticides should be evaluated in a given period. Instead, the Act gives the Department discretion to set priorities. Priority setting means that not every pesticide will be evaluated immediately.

■ Nor are we persuaded that the Department's use of the term "likely to be" instead of the statute's "may be" in determining a candidate for assessment runs afoul of the statute. Far more important than the descriptive "likely to be" or "may be" is the list of factors to be considered in prioritizing. Reform challenges the factors identified by the Department, arguing these factors do not comport with the factors enumerated in the Act. The Act lists as factors the amount or potential amount of emissions, the manner of usage of the pesticide in California, persistence in the atmosphere, and ambient concentrations in the community. (§ 14022, subd. (e).) In setting priorities, the Department considers the pesticide's physical and chemical properties, toxicity, and exposure. We agree with the trial court that the factors enumerated in the Act "are not so different from the department's new risk assessment policy as to be a violation of the statute."

### 2. *Procedural and Substantive Shortcomings*

Reform also asserts the prioritization process means that health-based determinations will not be based on the best available science. In Reform's view, the Department's prioritization review is a purely internal assessment

that preempts the TAC risk assessment process and undermines the roles accorded the Panel, the Office, and the public in that process.

However, under the prioritization process the initial grouping for risk assessment involves evaluation by the adverse effects advisory panel. This advisory panel is made up of senior scientists from three Department branches and the Office. The Department's recommendations as to candidates for priority are presented to the advisory panel for review and comment. The involvement of both the Office and the advisory panel continues throughout the process. Contrary to Reform's claims, neither the advisory panel nor the Office is shut out of the process, and their statutory roles in the TAC risk assessment process are unaffected by the Department's prioritization review.

### 3. Cumulative Impacts of Pesticide Air Pollution

■ Reform also claims the prioritization process fails to assess the cumulative impacts of pesticide air pollution in violation of the Act. However, as the trial court found, the Act does not require a cumulative impact analysis.

Reform attempts to argue otherwise, quoting the Act's definition of a TAC as an "air pollutant that may cause *or contribute to* an increase in mortality or an increase in serious illness." (§ 14021, subd. (b), italics added.) According to Reform, this language contemplates a cumulative analysis in determining whether a pesticide should be evaluated as a TAC. However, the factors the Act sets forth for prioritizing pesticides for evaluation do not include cumulative impacts. (§ 14022, subd. (e).) The trial court correctly refused to impose this requirement on the Department.

Reform specifically cites the Department's withdrawal of chlorpyrifos, azinphos-methyl, and molinate from the review process as evidence the prioritization process violates the Act.

According to Reform, the Department unilaterally withdrew these pesticides from the TAC review process despite significant disagreements between the Department and the Office over the relative risk posed by each pesticide. Both sides cite scientific studies in support of their positions on the safety question. The Department contends that it was not required to consult with (nor presumably to defer to) the Office on the health risks of the pesticides during this early screening stage, but in any event, its decision rests on sound scientific footing. The Department notes that the pesticides are cholinesterase-inhibiting compounds and cites a lengthy expert declaration on cholinesterase activity in the blood to support its decision.

Unaided by experts, we are not competent to resolve this dispute between scientific papers that require specific knowledge of chemistry, biology, and pesticides to fully comprehend—nor should we even make the attempt. The detailed and complicated nature of the science underlying the dispute supports the trial court's deference to the Department, which possesses the expertise and technical knowledge the court lacks.

4. *Implementation Delays*

Reform also contends the prioritization plan will lead to further delay in implementing the Act's review process. Reform claims the new process replaces the "streamlined TAC process with a new, resource intensive process," deferring meaningful review for years, "if ever." Again, Reform objects to the Department's efforts to prioritize pesticides to be reviewed as possible TAC's; under Reform's analysis prioritization equates with nonreview of pesticides.

As we have explained, the Department's effort to prioritize pesticides is an effort to comply with section 14022, subdivision (e). The Act does not set forth a timetable for evaluation but does mandate prioritization. Prioritizing pesticides according to factors akin to those listed in the statute represents the Department's effort to address the most serious risks to public health first. Given the number of possible TAC's, delays appear inevitable. Again, we agree with the trial court's assessment that "[w]hile the Department's process may be slow, it is not a complete failure to comply with the law so as to justify court intervention."

## IMPLEMENTATION OF THE ACT

Reform argues the Department failed to implement the Act as required by law. Specifically, Reform contends, under the Act, the Department must evaluate and implement necessary control measures for HAP-TAC's. A HAP-TAC is one of the pesticides identified as a federal hazardous air pollutant.

The Department agrees that under Food and Agriculture Code section 14021 it must list all pesticides that have been identified as HAP-TAC's pursuant to section 7412 of title 42 of the United States Code. The Department argues it has done so, but is under no duty to determine the need for or to implement control measures. Under the Department's analysis, it is required to evaluate and implement control measures only for TAC's listed through the process outlined in Food and Agriculture Code section 14023, subdivision (d).

The trial court agreed. After reviewing the applicable statutes, the court determined that since HAP-TAC's do not go through the process set forth in section 14023, they are not covered by the control measures set forth in section 14024.

The court also noted Reform "argue[s] that this cannot be the result intended by the legislature. However, this court is not to surmise what [*sic*] the legislative intent of a statute when the language of that statute is not ambiguous. The court must look first to the express language of the statute itself. The statutory scheme here does not express an intention that HAP-TAC's automatically are subject to the evaluation process set out in sections 14023 and 14024."

■ Section 14021 provides that pesticides that have been identified as HAP-TAC's pursuant to federal law shall be identified by the Department as TAC's. This eliminates the need for the Department to go through the evaluation process set forth in sections 14022 and 14023 in order to list HAP-TAC's as TAC's.

Section 14024, subdivision (a) states, in part: "For those pesticides for which a need for control measures has been determined pursuant to subdivision (e) of Section 14023 and pursuant to provisions of this code, the director . . . shall develop control measures designed to reduce emissions sufficiently so that the source will not expose the public to the levels of exposure which may cause or contribute to significant adverse health effects."

■ The HAP-TAC's do not undergo the evaluation process under section 14023; they are automatically identified as TAC's. The language of section 14024 states it applies only to pesticides "for which a need for control measures has been determined pursuant to subdivision (e) of Section 14023 and pursuant to provisions of this code." (§ 14024, subd. (a).) Subdivision (e) of section 14023 specifically requires the control measures procedure of the statute only for "toxic air contaminant[s subject] to [the provisions of] subdivision (d)." Subdivision (d) of section 14023 refers to TAC's identified through the process codified in sections 14022 and 14023. HAP-TAC's do not qualify under this language.

Reform argues that since the HAP-TAC's are listed under section 14021, subdivision (b) and section 14024 states "and pursuant to provisions of this code," HAP-TAC's qualify for mandatory control measures under section 14024. We disagree.

Section 14024 states it applies to "those pesticides for which a need for control measures has been determined pursuant to subdivision (e) of

Section 14023 *and* pursuant to provisions of this code." (Italics added.) The HAP-TAC's have been designated TAC's under section 14021; however, nowhere in that statute is it determined that control measures are needed for these TAC's. By its plain language, section 14024 does not apply to HAP-TAC's.

In any event, the Department notes it possesses the authority to take regulatory action to require control measures of HAP-TAC's under other provisions of the Food and Agricultural Code. The Department has implemented extensive control measures for one HAP-TAC and included three others in the list of nine active ingredients prioritized for risk assessment in March 2005.

## UNDERGROUND REGULATION

Reform argues the trial court erred in not finding the Department's prioritization policy constitutes an underground regulation. The trial court acknowledged the new policy was not adopted pursuant to the rulemaking procedures of the California Administrative Procedure Act (APA; Gov. Code, § 11340 et seq.). However, the court found the challenged procedure "is a matter of internal management and not subject to the rulemaking provisions of the APA. It is a determination of how the [Department] will undertake and comply with the statutes, i.e., to prioritize or create a priority list of pesticides to undergo full risk assessment and evaluation."

The APA applies to regulations. (*Pacific Gas & Electric Co. v. Department of Water Resources* (2003) 112 Cal.App.4th 477, 503–504 [5 Cal.Rptr.3d 283] (*Pacific Gas & Electric*).) A regulation is "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (Gov. Code, § 11342.600.)

"The APA establishes the procedures by which state agencies may adopt regulations. The agency must give the public notice of its proposed regulatory action (Gov. Code, §§ 11346.4, 11346.5); issue a complete text of the proposed regulation with a statement of the reasons for it (Gov. Code, § 11346.2, subds. (a), (b)); give interested parties an opportunity to comment on the proposed regulation (Gov. Code, § 11346.8); respond in writing to public comments (Gov. Code, §§ 11346.8, subd. (a), 11346.9); and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law (Gov. Code, § 11347.3, subd. (b)), which reviews the regulation for consistency with the law, clarity, and necessity

(Gov. Code, §§ 11349.1, 11349.3)." (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater*).)

*General or Specific Application*

The Department argues the prioritization process is not a regulation within the meaning of the APA because the Department does not utilize the process as a general standard to administer, implement, enforce, or make specific the law. Instead, it reflects the Department's efforts to comply with the law. In support, the Department relies on *Pacific Gas & Electric, supra,* 112 Cal.App.4th 477.

■ To be deemed a regulation subject to the APA, an agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. (*Pacific Gas & Electric, supra,* 112 Cal.App.4th at p. 504.)

In *Pacific Gas & Electric,* the utility filed a petition for writ of mandate challenging the manner in which the Department of Water Resources (DWR) carried out emergency legislation authorizing the buying and selling of electrical power during a statewide energy crisis. Pacific Gas and Electric Company (PG&E) argued the statute required that DWR determine its "revenue requirements" to cover various costs of the program and to determine that those requirements were just and reasonable. (*Pacific Gas & Electric, supra,* 112 Cal.App.4th at pp. 480, 487.)

PG&E also contended the method to determine revenue requirements was subject to the APA, and because DWR failed to follow APA procedures, the method of calculation should be unenforceable. The trial court granted the petition, finding the challenged method invalid and unenforceable because the legislation required DWR to conduct a review to determine whether the costs to be included in its method of calculation were just and reasonable, and the review had to be conducted pursuant to the APA. (*Pacific Gas & Electric, supra,* 112 Cal.App.4th at pp. 480–481, 487.)

This court found the law did require DWR to make a determination that its method of calculation was just and reasonable. However, we also held that the APA did not apply since the revenue requirement was not of general application adopted to implement the law, but related only to a finite period of time. (*Pacific Gas & Electric, supra,* 112 Cal.App.4th at pp. 481, 506.)

The Department argues that, as in *Pacific Gas & Electric*, its creation of a priority list is a discrete and specific project necessary to enforce the TAC statute, which grants the Department the discretion to give priority to the evaluation and regulation of substances based on risk of harm to the public health, amount of emissions, manner of usage, persistence, and ambient concentration.

The TAC statute does grant the Department the ability to prioritize pesticides for review. However, unlike *Pacific Gas & Electric*, where the court explicitly pointed out that the challenged method of determining DWR's revenue requirement was for a specific time or project, the prioritization of pesticides cannot be viewed as a discrete and specific project because a priority list will be applied to all pesticides in the state. Because the enforcement of a pesticide prioritization process, regardless of whether it is enforced formally or informally, will have a broad and long-term application, we conclude the policy was intended as a rule of general application.

*Adopted to Implement Statute*

 To be deemed a regulation subject to the APA, an administrative policy must " 'implement, interpret, or make specific the law enforced or administered by [the agency] or . . . govern [the agency's] procedure . . . .' (Gov. Code, § 11342, subd. (g).)" (*Tidewater, supra*, 14 Cal.4th at p. 571.) The Department argues the policy does not administer, implement, or enforce the Act. We disagree.

The purpose of the prioritization process is to make implementation of the Act review more efficient by determining the order in which pesticides will undergo risk assessment. The Department adopted the prioritization policy to implement the Act, which is enforced by the Department. Therefore, the prioritization process was adopted to implement the statute.

*Internal Management Exception*

 However, we also conclude the APA's internal management exception is applicable to the facts before us. The APA's definition of "regulation" specifically excepts a rule, regulation, order, or standard of general application that relates only to the internal management of a state agency. (Gov. Code, § 11340.9, subd. (d).) The scope of the internal management exception is narrow and inapplicable where a rule is to have general application and is to affect persons subject to regulation by the agency. (*Grier v. Kizer* (1990) 219 Cal.App.3d 422, 439 [268 Cal.Rptr. 244] (*Grier*).)

In *Grier*, the State Department of Health Services (DHS) implemented a procedure to audit physicians' claims for treating Medi-Cal patients. The Office of Administrative Law filed an opinion concluding the auditing method was a regulation, which was invalid because DHS had not complied with the APA. (*Grier, supra*, 219 Cal.App.3d at pp. 427–428.) The trial court agreed, finding the challenged audit method invalid. (*Id.* at p. 430.)

The appellate court affirmed. The court found the major aim of the Legislature in enacting the APA was to provide an opportunity for persons to be affected by proposed regulatory action to be heard on the merits of the proposal, and that DHS failed to show the auditing method at issue was exempt from the act's rulemaking requirements. (*Grier, supra*, 219 Cal.App.3d at p. 439.) The court held that any doubt as to the applicability of the APA's requirements should be resolved in favor of the APA. (*Grier*, at p. 438.) The court also concluded that DHS's auditing method did not come within the exception for rules relating only to internal management under Government Code section 11342, subdivision (b) since it was a standard of general application affecting persons subject to the agency's regulation. (*Grier*, at pp. 439–440.)

*Grier* cited *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198 [149 Cal.Rptr. 1, 583 P.2d 744] (*Armistead*), in which the Supreme Court rejected a contention that a regulation related only to internal management. The State Personnel Board had adopted a personnel transactions manual, which stated that an employee who resigns may withdraw that resignation only with the approval of the appointing power. (*Id.* at pp. 200–201.) The state adopted the manual without following APA procedures. (22 Cal.3d at p. 203.)

The Supreme Court held that the agency rule regarding an employee's withdrawal of a resignation is not within the meaning of the APA's internal management exception. (*Armistead, supra*, 22 Cal.3d at pp. 203–204.) In addition, the court held that merely having a manual that is inaccessible to the affected employees and the public does not automatically confer internal management status. (*Id.* at p. 204.) The court reasoned the regulation was obviously intended to be generally applied, to make specific for all state civil service employees the limits on their right to withdraw resignations. (*Ibid.*)

The *Grier* court also cited a case reaching a contrary conclusion: *Americana Termite Co. v. Structural Pest Control Bd.* (1988) 199 Cal.App.3d 228 [244 Cal.Rptr. 693] (*Americana*). In *Americana* the Structural Pest Control Board developed an active enforcement program for uncovering fraud, negligence, and incompetence in the industry. (*Id.* at pp. 230–231.) The agency inspected homes of participating homeowners. The homeowners then contacted termite companies designated by the agency and requested termite inspections. The

agency evaluated the resulting inspection reports to determine if the reports uncovered problems previously identified by the agency. (*Id.* at p. 231.)

The agency did not follow APA procedures in developing the program, and pest control operators whose licenses were suspended as a result of the program challenged the agency's action. The appellate court found the active enforcement program was not a regulation as defined by the APA, but instead constituted an internal enforcement and selection mechanism to determine if the licensee violated the Structural Pest Control Act. (*Americana, supra,* 199 Cal.App.3d at p. 233.)

Here, the Department's prioritization process is similar to the enforcement program in *Americana.* The Department was authorized to evaluate all pesticides in California, and the director was given the discretion to determine the order in which the pesticides would be evaluated. In *Americana* the enforcement program did not determine if the pest control operators violated the law; it merely provided a framework for gathering information to make that determination. Here, the prioritization policy will not determine if the pesticides will undergo review, but merely prioritize when the pesticides will undergo review.

*Grier* criticized the *Americana* decision, stating "[t]he fact that a rule pertains to enforcement does not establish that it relates only to internal management." (*Grier, supra,* 219 Cal.App.3d at p. 438.) However, most agencies need to make certain determinations in order to ensure the efficiency and enforcement of their statutory duty. These necessary decisions may well affect individuals or entities outside the agency itself. Where, as here, the agency's rule does not require the individuals or entities affected to do anything they are not already required to do, the rule should fall within the exception for internal management.

The allocation of the Department's resources should be considered an internal management determination that will ensure the efficiency and enforcement of the agency's statutory duty to evaluate all pesticides. We believe *Grier*'s strict construction of the internal management exception renders the exception almost obsolete. While it is important to the APA to protect the rights of individuals subject to an agency's regulation, it is also important to ensure that a state agency is able to efficiently complete its statutory duty. Thus, the APA includes the internal management exception in order to allow agencies to perform their statutorily mandated duties without the burden of APA procedures that do not advance the goals of the APA. The prioritization policy "relates only to the internal management" of the Department and need not comply with the APA. (Gov. Code, § 11340.9, subd. (d).)

## JUDICIAL NOTICE

Finally, Reform objects to the trial court's denial of its request for judicial notice of scientific studies. The Department objected to the exhibits based on a lack of foundation. The trial court sustained the objection and denied Reform's request for judicial notice.

Reform argues it did provide a foundation for the studies, specifying the Web site and journals where the studies were obtained. In addition, Reform contends its request comported with Evidence Code sections 452, subdivision (h) and 453, subdivision (a). Reform provided evidence that the studies were "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).)

The Department argues it objected to the studies for lack of foundation, not as to their existence or the fact that they were published, "but that they are being presented for the truth of the matters stated therein." In addition, according to the Department, the studies are objectionable on hearsay grounds.

Reform requested judicial notice pursuant to Evidence Code section 452, subdivision (h), which states judicial notice *may* be taken of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." Reform also requested judicial notice pursuant to Evidence Code section 453, which states that the court shall take judicial notice of any matter cited in section 452 if a party requests it and gives the opposing party sufficient notice of the request and furnishes the court with sufficient information to enable it to take judicial notice of the matter.

Reform argues it did not submit the studies to contest a disputed point, but to illustrate that the studies show pesticides have been detected in air samples. Although Reform contends the trial court erred in not taking judicial notice of the studies, Reform acknowledges: "Whether these studies are considered or not considered, there is no dispute over the primary fact that pesticide air pollutants are a matter of statewide concern that require regulatory control." Given Reform's comments, it could not have been prejudiced by the court's denial of its request for judicial notice.

## DISPOSITION

The judgment is affirmed. The Department shall recover costs on appeal.

Sims, Acting P. J., and Hull, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 11, 2010, S183962. George, C. J., did not participate therein.